SIGAL CHATTAH
United States Attorney
Nevada Bar No. 8264
STEVEN W. MYHRE
Nevada Bar No. 9635
JUSTIN J. WASHBURNE
Assistant United States Attorneys
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Steven.Myhre@usdoj.gov
Justin.Washburne@usdoj.gov

*Attorneys for the United States.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID E. BORUCHOWITZ,<br><br>Defendant. | Case No. 2:23-cr-00149-APG-BNW<br><br>**Government's Sentencing Memorandum** |

**Certification: This Memorandum is timely filed under Local Criminal Rule 32-1.**

The government seeks a three-year term of probation with terms and conditions that include 12 months' home detention, and a disclosure of conviction requirement as described herein. As a further condition of probation, the government seeks an Order of Restitution under the Mandatory Victims Recovery Act (MVRA") in the amount of $244,939, payable to Angela Evans. As explained below, this sentence falls within the Plea Agreement, and is a reasonable sentence under the United States Sentencing

Guidelines ("USSG" or "Guidelines") and the sentencing factors set out in Title 18,
United States Code, Section 3553(a) ("Section 3553 Factors").

I.      NATURE AND CHARACTER OF THE OFFENSE CONDUCT AND
        CHARACTERISTICS OF THE DEFENDANT.

While the government agrees generally with description of the offense conduct set out in Part A of the PSR, it submits the following to further clarify and explain the nature and character of the offense conduct to which Boruchowitz has pleaded guilty in Counts One and Four of the Indictment. In support hereof, the government offers the exhibits listed at Appendix A and requests the opportunity to present evidence[1] at hearing from the FBI case agent who investigated the case and Ms. Evans.[2]

        A.      Background.

Boruchowitz arrested Angela Evans as part of fraud scheme to influence a recall election to oust the VEA Board of Directors. The scheme was to concoct a crime against Evans, arrest her, then sensationalize the arrest to create public outrage that would either force the Board members to resign or cause the VEA members to vote them out. The Evans arrest was never about any legitimate law enforcement concern about pilferage at VEA; it was about pushing the false narrative that Evans was a criminal and the VEA Board of Directors had done nothing about it.

The scheme was hatched in a meeting that occurred between Boruchowitz and Ken Johnson, a former officer of VEA, on February 15, 2019. It culminated eleven days

---

[1]     The government will file the exhibits in advance of the hearing. All of the exhibits have been included in the government's Rule 16 disclosures to the defendant and it will provide a courtesy copy to the Court in advance of the hearing.

[2]     Fed. R. Crim.P. 32(i)(2).

later with the Evans arrest and Johnson's interview during the news coverage of the arrest.

This Memorandum addresses these bookend events and focuses on Boruchowitz's abuse of his position as a deputy sheriff to deceive the local court into approving probable cause for the arrest. As shown below, Boruchowitz filed two false search warrants and a false and misleading Declaration[3] as part of the scheme to defraud, all of these documents being used to knowingly deceive the court as to probable cause and all serving as vehicles to take Evans and VEA's Board down in the press.

As detailed in Section H below, Boruchowitz and Johnson celebrated the successful execution of their scheme in private communications. When several board members resigned under public pressure after Evans' arrest, Boruchowitz texted Johnson: "that was the plan. Resignations (sic) is better than recall." And when Evans was fired, Boruchowitz was jubilant, exclaiming: "Winner, winner, chicken dinner."

**B.      The Fraud Scheme Is Hatched – The Secret Meetings Between Boruchowitz and Johnson.**

Boruchowitz and Johnson had a clandestine meeting at a park on February 15, 2019, to plot how they could take down VEA's board of directors and Evans. They both had reasons to be angry with VEA's management. Boruchowitz was furious because VEA had announced an increase in the price of electricity for the first time in ten years,

---

[3]  "Declaration" as used throughout this Memorandum refers to the term "Declaration of Probable Cause" which is a document sworn to and filed with the local court after an officer makes a warrantless arrest. Like a search warrant, the Declaration sets out the officer's probable cause belief for making the arrest. This document is reviewed post-arrest by a Justice of the Peace who either affirms or rejects the probable cause determination. If probable cause is not found, the Justice of the Peace will quash the arrest. In the case of Evans, the Justice of the Peace found probable cause based on the Declaration submitted by Boruchowitz and did not quash the arrest. Evans had bonded out of jail by the time of the post-arrest review.

3

and, as a VEA customer—known as owner-members because VEA is an electric utility cooperative—he took this price increase personally. For his part, Johnson had competed for the VEA's CEO position before Angela Evans was hired for the position, and he blamed VEA's board and Evans for being passed over for the CEO position and eventually being forced out of the company. After leaving VEA, Johnson formed VEA Members for Change ("VEAMC"), which he described as a grassroots organization dedicated to ousting the VEA Board of Directors through a recall election. Boruchowitz and Johnson used the public anger about the proposed rate increase as a means to pursue their personal vendettas and to galvanize support for the VEAMC-sponsored recall election which would lead to replacing Evans and the Board of Directors.

During this initial meeting, Boruchowitz laid out his criminal scheme: "Start with dereliction. And then once you're in, you can figure out was there criminal, and then you can go that route." This conversation was preserved in a secret recording that Boruchowitz kept in his personal residence and outside of any official police case file. Before Boruchowitz even had a single piece of information indicating that VEA or Evans had engaged in criminal activity -- and he never found any – he was already planning to gain access to VEA's records to find something "criminal."

This plan followed a familiar blueprint Boruchowitz had used previously to corruptly influence an election for Nye County Sheriff in favor of his preferred candidate. As Boruchowitz explained to Johnson during the February 15 meeting, once the candidate for sheriff was arrested for allegedly stealing a campaign sign it "was his kiss of fate." Boruchowitz also told Johnson his office could make great "video press

1  releases" to influence the VEA recall petition just as they had done to influence the Nye

2  County Sheriff's election.

3      Boruchowitz met again with Johnson a few days after, on February 21, and their

4  plan began to take shape. Boruchowitz told Johnson about an impromptu, private

5  conversation[4] he had with a local television producer right after he had been interviewed

6  by a reporter about the recall. In that televised interview, he criticized Evans and the

7  Board for raising rates, claiming the membership had been lied to. Immediately after

8  giving this interview, Boruchowitz spoke with the TV producer, who mused that VEA

9  had to raise rates because it paid large sums of money to cover-up internal complaints

10  about a sexual relationship between the former-CEO and another VEA employee. He

11  said nothing that implicated Evans and offered no proof of these unsubstantiated

12  rumors.

13      During his follow-on secret meeting with Johnson, the two men discussed this

14  water-cooler gossip. Johnson began to spin a story that Evans must have been promoted

15  to cover-up the allegations since that would be the only reason to promote her over him.

16  That was all Boruchowitz needed – he told Johnson he was going to get a search

17  warrant and asked what documents he should include in the scope of the warrant.

18      **C.    The False Search Warrants.**

19      From that meeting onward, Boruchowitz focused on leveling criminal

20  allegations against Evans. After his meeting with Johnson, he drafted a search warrant

21

22  [4]  Like his meetings with Johnson, Boruchowitz surreptitiously recorded this meeting and used selective
information from it for search warrants and to support the Evans arrest. However, none of his secret
23  recordings, including this one, was entered into evidence or noted in any police report or the investigative
file. As the recordings make clear, the gossip passed on by the TV producer did not implicate Evans at all
and nothing in the recording suggests that the producer was making an "on the record" criminal
24  complaint.

affidavit for a records search of VEA ("Search Warrant I"). Search Warrant I attempted to transform the workplace gossip he heard from the TV producer into evidence of a criminal violation involving Evans. His affidavit told the Justice of the Peace that "Sheriff's Office employees" were told by "prior Valley Electric employees" that Angela Evans had "received substantial payment and was involved in the handling of payments" to suppress complaints of "sexual misconduct" at VEA.

Completely missing from the affidavit was any context. There was no mention of the gossip he heard from the TV producer about a workplace love affair that did not involve Evans or that this topic came up during a conversation after a television interview where Boruchowitz leveled criticism at VEA and Evans about rate increases. Also missing was any mention that Johnson (a supposed source of this information) had been secretly recorded or that, during the recording, Johnson reasoned that Evans was involved in a cover-up because she was promoted to CEO and he was not. Instead, the affidavit left the false impression that law enforcement officers were gathering information in interviews conducted as part of a legitimate criminal investigation into a sex crime cover-up at VEA.

Boruchowitz kept his name off the affidavit entirely and brought in another officer to present it late that night at the home of a Justice of the Peace, who reluctantly approved it. The next morning (February 22), Boruchowitz showed up at VEA with more than a dozen officers while an advance team took what they referred to as B-roll[5]

---

[5]   A term used in news reporting when referring to video images captured and used as background to explain a news story.

6

videos of NCSO[6] vehicles rolling into the VEA parking lot and officers descending upon the VEA headquarters building.

The search generated terabytes of data that was never searched or analyzed. It also generated a lot of press coverage, complete with NCSO provided B-roll images. Over the next few days, VEA and the NCSO fired off a series of dueling press releases, with the VEA claiming it was the victim of an illegal search and the NCSO claiming it was conducting a legitimate embezzlement investigation. It was against this backdrop that Johnson sent an email on the evening of February 25 to the NCSO, reporting that he received an anonymous "tip" that Evans had work done at her house back in April 2018 at a "cost of $89,000" that was "paid by VEA funds."[7]  He then texted Boruchowitz to tell him that the Board of Directors was meeting the next morning and it would be "dramatic" if he could make an arrest.

Boruchowitz drafted a second search warrant ("Search Warrant II") for records at VEA. This affidavit said that during the sex crime cover-up investigation, an unnamed "street source" told Boruchowitz that Evans had "89,000 worth of work at her house to move her powerlines underground and billed them to Valley Electric." The affidavit said that an investigator interviewed an employee who "confirmed the work was done" at Evans' house and that customers usually paid for this work.

The affidavit said that another unnamed "street source" provided "print outs of the two work orders" that showed the power line burial was invoiced as "System I"

---

[6]  Nye County Sheriff's Office.

[7]  Phone records show that before Johnson sent the email, he and Boruchowitz spoke by telephone three times followed by a Boruchowitz text to Johnson: "let me know you've sent it." After sending the email, Johnson texted: "You should have it." None of these conversations was documented in a police report or to the investigative file.

which, according to the affidavit, stood for System Improvement, meaning the costs of the work were depreciated. The affidavit attached images of the "print outs" and said that another detective observed that Evans' "property is the only residence on that block that does not have powerlines running across the back easement."

Missing from the affidavit was the fact that the "street source" who initiated the allegations was Johnson and omitted any information about Johnson's prior work relationship to Evans and VEA. Also missing was the fact that the interviewed employee told the detective that **no** power lines were buried on the property – rather, he had moved a pole and guy wire that protruded into the yard and had heard of no misconduct at VEA. Also missing was the fact that the second so-called "street source" who provided the "work orders" was Boruchowitz's close friend who worked in a line shed at VEA and had done no work at Evans' house. He had been asked by Boruchowitz to search VEA's time records for records associated with numbers that had been provide to him by Boruchowitz.

Without Boruchowitz's lies and omissions, he would not have received judicial approval for his search warrants, and his scheme to get into VEA's records and "find something criminal" would have failed. No reasonable judicial officer would approve probable cause for a search warrant that alleged a crime committed by the CEO when the affiant was an advocate for an organization dedicated to the removing the CEO and VEA Board from their positions. Boruchowitz omitted this known fact from his affidavit.

No reasonable judicial officer would approve a search warrant alleging that the CEO embezzled from VEA by burying power lines on her property when the person

bringing the complaint was a disgruntled former VEA officer who told the affiant that he blamed the CEO for losing his job. These known facts were omitted.

No reasonable judicial officer would approve a search warrant for the crime of burying a power line when an employee who performed work at the residence said that no power lines were buried on the property. Boruchowitz omitted this known fact from his affidavit.

No reasonable judicial officer would approve a search warrant alleging that work orders showed that power lines had been buried on the property when the so-called "work orders" were images of unexplained documents provided to Boruchowitz by his good friend: (a) who had no idea what the images represented; (b) who was not a VEA records custodian; (c) who had done no work at Evans' residence; (d) was an employee of VEA who had been asked by a law enforcement officer to conduct a warrantless search of VEA's time records; and (e) who was provided the numbers by which to search by that same law enforcement officer. These known facts were omitted from the affidavit. Moreover, none of the conversations with his friend or the circumstances surrounding the obtaining of these images was noted in a police report or referenced in the investigative file.

Nothing close to resembling probable cause for Search Warrant II existed and no rookie officer – let alone a supervisory officer with more than 16 years of law enforcement experience – would attempt to advance such a false and misleading document to a court of law, let alone swear to it under oath and enter it as a public document.

1    **D.    The False Arrest of Evans.**

2        Boruchowitz obtained Search Warrant II in the late afternoon of February 26,

3    swearing out the affidavit before the same Justice of the Peace who approved Search

4    Warrant I.  He went to VEA thereafter to conduct the records search called for the by

5    warrant.

6        When he arrived at VEA, Boruchowitz spoke with Evans and asked her whether

7    she had power lines buried on her property that was paid for by VEA. She denied the

8    allegation and said that prior to her purchase of the house, she facilitated a discussion

9    between the contractor and VEA about moving a pole and guy wire from the property

10   she was interested in purchasing so a wall could be built. She said it was likely paid for

11   by the contractor and that she probably paid for it when closing on the property. She

12   said that if records showed that VEA paid for it, it was probably a mistake. Boruchowitz,

13   and the several officers with him, then proceeded with the records search assisted by the

14   VEA Chief Financial Officer (CFO) and two VEA records custodians.

15       While Boruchowitz was conducting the search, Evans went back to her private

16   office to answer emails, having spent most of that day in the Board of Directors meeting.

17   During the search, the records' custodians told Boruchowitz that they did not have

18   records as described in the warrant but that they had records that showed a pole and guy

19   wire had been moved from the Evans property in April 2018. The CFO said that the

20   costs for the pole and guy wire movement had been designated as a System

21   Improvement by VEA engineers, meaning that VEA assumed the cost of the project.

22   The CFO, who had been recently hired by VEA, told Boruchowitz that he did not fully

23   understand how System Improvement was designated and that Boruchowitz would have

24

speak with an engineer. There was no indication in VEA's records that Evans, who, at the time, did not own the property and was neither an engineer nor the CEO, directed the project to be designated as a System Improvement.

Boruchowitz told the CFO, falsely, that he had already spoken with an engineer. The CFO responded: "Well, you have what you need then." Around 5:30 p.m., the records' custodians printed out the documents they found and handed them to Boruchowitz, who said that he and his officers were done with the search and were leaving the property to go home, commenting that it was the end of the workday.

The CFO began to escort Boruchowitz and his team from the building when Boruchowitz altered his path of exit to go down a hall where the VEA private offices were located, prompting the CFO to say "you've taken a wrong turn" or words to that effect. Bourchowitz responded with words to the effect of "now we have to walk the long way around."  As Boruchowitz walked down the hall, he observed that Evans was still there, working in her private office. Rather than asking to speak with Evans as he had done when he entered the building, Boruchowitz asked the CFO if he and his officers could stop and use a private office for a moment.

The CFO said yes. The officers then went into an adjacent office where Boruchowitz told the officers that they had developed probable cause for an arrest because the work done on Evans' house was "purposefully done as a system improvement that it is not."

Boruchowitz then emerged from that office and walked down the private hallway to Evans' office where, around 5:40 p.m. and ***without a warrant***, he barged into Evans' office, passing the CFO who stood in the doorway. "One last thing, Angela you're under

arrest for embezzlement. Go ahead and stand up out of your chair please," he commanded. Evans exclaimed: "What?!?" as she tried to stand up. Bourchowitz swung behind her, grabbing her by the arm: "Turn around and put your hands behind your back," moving her into position so another officer could handcuff her. He then began reciting Miranda warnings, the arrest being fully captured on BWC.[8]

An employee asked: "Do you guys really have to cuff her?"  Boruchowitz responded: "Yeah when we arrest people unfortunately we do."

After being handcuffed, officers "perp walked"[9] Evans from her office, through the building in front of VEA employees, and into a parking lot. There, while still in handcuffs, she was publicly frisked in front of cars driving by, put into the caged backseat of the squad car, and taken to the NCSO detention facility. There, she was booked, photographed, and jailed.

### E.    The False Press Release.

The BWC images of Evans' cuffing and booking were incorporated into a video press release that Boruchowitz orchestrated and posted on the internet that evening. The release was an elaborate video storyboard featuring snippets from BWC recordings of the arrest and B-roll of the VEA search from Search Warrant I:

> The Nye County Sheriff's Office is currently investigating allegations that ***embezzlement is occurring at Valley Electric by CEO Angela Evans and Valley Electric Board Members.*** The allegations include that ***they spent VEA monies to pay off key management employees to keep quiet a sexual harassment misconduct incident that occurred by then CEO Thomas Husted*** (image of Husted). During the course of this investigation, ***a source came to the NCSO investigators and advised that CEO Angela Evans had Valley Electric do***

---

[8]  Body worn camera.

[9]  A colloquial term used to describe publicizing an arrest by parading the arrestee before others in public.

***approximately $89,000 worth of work at her home*** (image of Evans' home) ***to move her powerlines underground.*** It is alleged that ***she billed the work to Valley Electric***. The source advised that the work was done in April 2018 (B-roll images of NCSO squad cars moving into VEA parking lot) and was able to provide work order information and names of Valley Electric employees who knew of the work being done. [Image of Evans' residence].

The NCSO executed a second search warrant at Valley Electric on February 26, 2019 (images from B-roll of officers arriving at VEA). The warrant requested electronic records of any and all work orders for CEO Angela Evans' residence. After execution of the search warrant, the records identified that the ***cost of the work*** valued at approximately $75,000 ***was not paid for by Angela Evans but was billed to the Valley Electric Cooperative.*** [image of Evans' residence]. CEO Angela Evans was placed under arrest. [image of Evans in handcuffs].

The words in ***bold italics*** in the new release were taken from Search Warrant I and II. Much of this same information was included in the ***post-arrest*** Declaration that Boruchowitz filed with the court after the arrest.

## F.    The False Declaration.

After the Evans arrest, Boruchowitz filed a Declaration that contained his probable cause statement for the arrest. The Declaration mirrors the allegations in Search Warrant II in all material respects. As with Search Warrant II, the Declaration asserted that Evans had VEA bury power lines on her property which she then billed to VEA. He attributed this information in both documents to a "street source."

As with Search Warrant II, Boruchowitz purposefully concealed Johnson as the source of information, referring to him anonymously as a "street source," which misdirected the Justice of the Peace when determining probable cause.

A review of the transcripts of the secret recordings reveals at least four irreducible material facts – known to Boruchowitz – that impugned the credibility of both men as to any future criminal allegations against Evans.

- Johnson was a disgruntled former employee who blamed Evans for losing his job.

- Boruchowitz told Johnson that believed Evans should be gone from her CEO job because he believed that she lied to VEA membership about the utility rate increase.

- Boruchowitz and Johnson agreed to work together to oust the VEA Board of Directors in the recall election and that Boruchowitz would accept a seat on the replacement Board.

- Johnson knew that Boruchowitz was a law enforcement officer and offered to pay him money.

This magical transformation of Johnson from a disgruntled former employee with a grudge against Evans into an anonymous "street source" left the Justice of the Peace with the false impression that the information in Search Warrant II and the Declaration was coming to a disinterested investigator from a tipster of neutral or unknown credibility. By concealing Johnson's identity and his known bias, Boruchowitz purposefully misled the Justice of the Peace as to the credibility of the affiant and the person bringing the allegations of criminal misconduct.

The misdirection did not stop there, however. Boruchowitz intentionally omitted from his Declaration any reference to the fact that his investigators had been specifically informed that no power lines were buried in Evans' backyard and that VEA record custodians told him the same thing during the search. During the search, Boruchowitz learned that information contained in his search warrant affidavit was not correct, that no power lines had been buried at Evans residence in April 2018, and that guy wires and a pole had been moved. This same information was explained to him by Evans at the outset of the search. Rather than speak with an engineer about the designation of this

14

work as a system improvement – as suggested by the CFO – or ask Evans about it as he was leaving the property, he arrested Evans immediately.

The Declaration centered on allegations that Evans **billed** VEA for power lines that the company had **buried on** her property. Yet, as he well knew at the time, he had uncovered *no* evidence to that effect and possessed information that directly contradicted this assertion and undercut its veracity.[10]

The suppression of this exculpatory information vitiated probable cause for the arrest of Evans. Moreover, the known falsehoods about buried power lines intentionally misdirected the Court which approved the Declaration supporting the arrest. Most insidiously, however, this was all done for the sake of publicity that would advance the cause of VEAMC for which Boruchowitz had knowingly become an advocate.

### G.    The False Press Release.

Johnson and Boruchowitz coordinated with each other to roll out the news of the Evans arrest. Shortly after sending the February 25 email, Johnson texted Boruchowitz: "let me know if arrest happens. I'll tip channel 8." After obtaining Search Warrant II, Boruchowitz called Johnson at 4:54 p.m., speaking with him for about a minute.[11] Thereafter, at 5:16 p.m., Johnson alerted VEAMC membership to the potential arrest of Evans by posting on the VEAMC Facebook page: "Word is Sheriff on-site with warrant and possible arrest at VEA."

---

[10]    The work orders Boruchowitz seized from VEA on the day he arrested Evans revealed that the power lines to Evans' property had always been underground. Therefore, there were never any lines across the property for VEA to bury. Eric Johnson—the VEA engineer who staked the project at Evans' home—confirmed this fact in a post-arrest interview with Boruchowitz on April 18, 2019. Despite receiving this clear contradictory evidence, Boruchowitz continued to press the DA's Office for charges against Evans and did not issue a press release retracting his defamatory statements about her.

[11]    There is no police report documenting this call or the topic of discussion.

At 5:44 p.m., Boruchowitz entered Evans office to make the warrantless arrest. At 6:03 p.m., he called Johnson and spoke for about 4 minutes. At 6:11 p.m., Johnson alerted VEAMC membership to the arrest, posting on the VEAMC Facebook page: "Angela has been arrested."

At 6:51 p.m., Johnson told Boruchowitz that he had triggered the media: "[c]hannel 8 on the way . . . going to interview for reaction . . . was going to lean in calling for Board to resign and encourage other employees and former employees to come forward with info." About a minute later, Boruchowitz responded: "She just called me. And ya sounds great."

At 9:26 p.m., Boruchowitz issued the press release discussed above. At 9:27 p.m., Boruchowitz informed Johnson that the NCSO had launched the narrative: "It's out." Johnson then interviewed with Channel 8.

The Channel 8 News at Eleven picked up on Boruchowitz's press release that evening, featuring it as the lead story. Pulling from the language in the release, the television announcers intoned:

> "*Tonight, an arrest at Valley Electric after the investigation into a cover-up leads to embezzlement charges for the CEO.*" As a backdrop for this introduction, the BWC of Evans arrest played, containing this image:



The broadcasters continued:

*The video you are watching is body cam video of her arrest. And this* [image below flashes on the screen] *is tonight's mug shot of Angela Evans.*



*She is charged with embezzlement for using company money to pay for work at her home. Her arrest comes as the Nye County Sheriff's Office digs deeper into claims that a rate hike was used to keep a sexual misconduct case quiet."*

Repeating Boruchowitz's press release, the announcer stated:

*a source told police that Evans made Valley Electric employees move her power lines underground at her home here in Pahrump last April.*

An image of Evans' home contained in the NCSO press release then appeared on the television screen.

The announcer continued:

*A second search warrant was issued at Valley Electric today requesting work orders for Evans. The work to her home cost about $75,000 but police say she didn't pay for it; Valley Electric did.*

The broadcast then re-flashed Evans mug shot, followed a by video segment of the Johnson interview, with Johnson standing in front of the NCSO where Evans was held in custody.



Johnson said:

*On Friday, the Nye County Sheriff's Department raids the VEA facility with a search warrant. Twenty-four hours later there is an arrogant denial. They didn't initiate their own internal investigation. And then we get this tonight. And it shows a clear failure on the part of the Board to do their duty for the members.*

### H.    Mission Accomplished: Evans is Fired and The Board of Directors Resigns.

Johnson and Boruchowitz continued to work together on their scheme to recall the Board of Directors after the Evans arrest. Boruchowitz told Johnson that the NCSO had referred the embezzlement charges to the Nye County District Attorney. Boruchowitz kept Johnson apprised of the status of the charges against Evans.

In the meantime, VEA placed Evans on administrative leave and initiated an internal investigation to review whether she had embezzled any services from VEA. Johnson heard of this and became concerned that Evans would keep her job. He then pressed Boruchowitz for information about when formal charges would be filed against her. Boruchowitz assured Johnson that he was developing information that would result in embezzlement charges against Evans.

Board members began to resign in the aftermath of the Evans arrest; however, no charges were brought by the District Attorney. In May, Boruchowitz told Johnson that he was no longer interested in running for the Board. As Board members were resigning from office, Boruchowitz texted to Johnson: "It's good to win. Got rid of the worst and that was the plan. Resignations is (sic) even better than recall. Called running scared."

The VEA internal investigation, however, found that Evans had not embezzled any services from VEA. Nevertheless, in July the VEA Board announced that it was firing Evans, despite the findings of its internal investigation. The Board told Evans that her arrest had caused VEA Membership to lose trust in her and the Board believed that trust could not be re-instilled notwithstanding the internal investigation. When Johnson informed Boruchowitz of the firing, he texted in response: "Winner, winner, chicken dinner."

No recall election ever occurred. Johnson and Boruchowitz ended their involvement in VEAMC around the end of September 2019. In November 2019, the District Attorney's Office announced that it formally declined any prosecution of embezzlement charges against Evans. This prompted the NCSO to issue yet another press release on this topic, proclaiming that a declination did not mean that Evans was innocent:

> [Evans] was arrested based on probable cause after a review of the evidence against her. A judge found that they (sic) agreed that there was probable cause on February 27th.

In October 2020, Evans filed a civil action in U.S. District Court in Nevada (2:20-cv-01919-RFB-VCF), alleging claims for false arrest and civil rights violations against Boruchowitz, the NCSO, and Nye County. Civil discovery ensued, which included the taking of Boruchowitz's deposition in March 2021. In November 2021, the defendants in that action filed a motion for summary judgment which was denied as to Boruchowitz in January 2023. This case was indicted in August 2023. The civil case settled and it was dismissed by stipulation in January 2024.

## II.    PROCEDURAL POSTURE.

The Indictment was returned on August 16, 2023, and charged as follows:

- Count One – Title 18, United States Code, Section 242 (Deprivation of Rights Under Color of Law)

- Counts Two through Five – Title 18, United States Code, Section 1343 (Fraud by Wire)

- Count Six – Title 18, United States Code, Section 1621 (Perjury).

On March 12, 2025, Boruchowitz entered pleas of guilty to Counts One and Four of the Indictment pursuant to a Plea Agreement, Count Four addressing the false press release following Evans' arrest as discussed herein.

On May 5, 2025, the Court's probation office issued its initial PSR to which the government and Boruchowitz filed objections. On May 30, 2025, the probation office issued a Revised PSR which resolved some of the objections of the parties.

On June 3, 2025, the Court set the sentencing hearing for July 15, 2025, pursuant to stipulation of the parties. This Sentencing Memorandum follows, addressing unresolved objections to the PSR and discussing the government's sentence recommendation for the offense conduct.

### III. OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

The government does not agree with the PSR's Guidelines calculation for the reasons set out in its objections below and contends that the Adjusted Offense Level is 12 vice 20. While the government agrees generally with the PRS's rendition of the offense conduct, it raises specific fact objections delineated below. It is also the government's position that the resolution of these fact objections is not material to the adjudication of a probationary sentence in this case.[12]

**1. Objections to Factual Assertions in the PSR.**

**Paragraph 8**. Misleading – Suggests False Premise.

Paragraph 8 suggests that Boruchowitz changed his mind about assuming a Board position once he began a criminal investigation. Boruchowitz opened his first criminal investigation after his second meeting with Johnson on February 21. Boruchowitz first told Johnson of his interest in assuming a seat on the Board at their first meeting on February 15. The unseating of the existing Board was a constant topic of discussion between the two men throughout their relationship and Boruchowitz never

---

[12]    *See* Fed. R. Crim. P. 32(i)(3)(b).

said he was not interested in taking a seat until Johnson raised the topic in a text message in May 2019. By that time, it was manifest that the DA was not going to charge Evans.

The PSR incorporates counsel's characterization of Boruchowitz's interest as "one throwaway line" and that "[o]nce the VEA investigation [of the so-called hush money investigation] began, [Boruchowitz] expressly declined interest in serving as a Board Member." There is no evidence that Boruchowitz ever declined any interest in serving on the Board before the Evans arrest. Arguments and characterizations should not be asserted as fact in the PSR. As such, paragraph 8 is misleading.

**Paragraph 15.**  Misleading – Misstates the Evidence.

Paragraph 15 misstates the NCSO interview of KK, the VEA employee who moved the pole and guy wires. The PSR states that a NCSO deputy interviewed KK, that KK was an engineer with VEA, and that KK confirmed "the work done at A.E.'s residence and advised it was usually the homeowner's responsibility to pay for such work. KK did not confirm that power lines were buried on Evans property -- which Search Warrant II alleges as the "work done" at the Evans residence. Moreover, the NCSO investigative file contains no evidence that anyone ever alleged that power lines were buried on Evans property. This suggests that these allegations had their origin in an undocumented contact with Johnson and, as the KK interview establishes, those allegations were false.

KK told NCSO investigators on the evening of February 25 that he moved a pole and a guy wire that held up the pole which protruded into the backyard of Evans residence. He also stated that electrical power did not go to the guy wires.  Lastly, KK introduced himself to investigators as a "Journeyman Lineman." He did not state that he was a VEA engineer and there was no evidence adduced to suggest that he was an engineer. As such paragraph 15 misstates the evidence and is misleading.

**Paragraph 20**.  Irrelevant and Misleading as to Power Lines and Guy Wires.

Paragraph 20 states that on February 28, 2019, A.E.'s realtor said that A.E. had told the realtor that she would be speaking with VEA engineers to "remove the cable or bury it." This information is irrelevant because the interview occurred after the arrest of Evans and, therefore, could not form a factual basis for a probable cause arrest that occurred two days previously. It is also misleading because it is unclear whether the realtor was speaking about a guy wire or a power line or both. As such, paragraph 20 is misleading and irrelevant. The confusion between guy wires and powerlines resulted from the fact that Boruchowitz's affidavit insisted that powerlines were buried – a cosmetic alteration of the property by moving suspended power lines from overhead to underground. Guy wires, which carry no power and are not suspended overhead and that protrude into someone's yard, presents a safety issue not cosmetic issue. Evans freely told Boruchowitz at the search that she facilitated a discussion to move a guy wire so a wall could be built. This should have alerted Boruchowitz to the fact that the

22

information in his warrant was bad. In practice, guy wires cannot be confused with power wires – they have distinctly different purposes and there would be no reason to bury a guy wire. Instead of checking the accuracy of his information, he doubled down on it. The obfuscation was intentional as Boruchowitz was looking for anything "criminal" and intentionally misdirected.

**Paragraph 23**. Irrelevant and Misleading as to the reason for firing.

Paragraph 23 refences a violation of VEA Employment Policy #107 as partially founded in an internal investigation that also cleared Evans of any claim that she embezzled services from VEA. As worded, the paragraph could be read to imply that Ms. Evans was fired as a result of a policy violation.

Evans received two termination letters.[13] These documents speak for themselves. None of them, however, states expressly or impliedly that distrust (the basis for the firing) was engendered by anything other than her arrest and the pendency of a post-arrest charging decision at the District Attorney's Office. As such, paragraph 23 is misleading as written.

## 2. Objection to Guidelines Calculation.

Contrary to the Guideline calculation in the PSR, the government argues and maintains that the Adjusted Offense Level is 12, vice 20, under the Guidelines. The government objects to the PSR as follows.

### a.    Base Offense Level 6 vice 12 under USSG § 2H1.1(a)(4).

The PSR applied a Base Offense level 12 for "two or more participants" in the Section 242 violation, under USSG § 2H1.1(a)(2). The government objects and contends that Boruchowitz was the sole participant in the Section 242 violation; thus a Base Offense level 6 applies under USSG § 2H1.1(a)(4).

The PSR identifies Johnson as the additional participant in the Section 242 violation. The term "participant," however, is defined as a "person who is ***criminally*** responsible for the commission of the offense but need not have been convicted." USSG § § 2H1.1, comment. (n.1) (emphasis added).

The Section 242 violation arose from Boruchowitz's deliberate falsification of Search Warrant II and the Declaration. While Johnson accused Evans of a crime, knew of the arrest, encouraged it, and participated in post-arrest publicity, he did not make the arrest and there was no evidence adduced to show that Johnson ***knowingly*** assisted Boruchowitz in making or filing false court document filed in relation to the arrest.

---

[13]    Filed at Exhibits 20 and 21.

Accordingly, the government did not charge Johnson as an aider and abettor in the Section 242 violation. Hence, Johnson is not a "participant" as that term is defined under the Guidelines.

### a.    Plus Six Levels for Specific Offense Characteristics.

The government agrees with the PSR that the base offense should be increased by six levels because the defendant was a public official and the violation occurred under color of law in accord with USSG §§ 2H1.1(b)(1)(A) and (B).

### b.    No Obstruction of Justice Adjustment Under USSG § 3C1.1.

The government objects to a 2-level increase for Obstruction of Justice arising from the perjury conduct charged in Count Six of the Indictment. The government has agreed to dismiss Count Six and will not adduce evidence at the sentencing hearing on the dismissed count. Accordingly, there is insufficient evidence on this record to support the application of this adjustment.

Further, Count Six addresses Boruchowitz's deposition which occurred before the initiation of the criminal investigation that resulted in the instant charges. Thus, the deposition was a historical event when the criminal investigation began and did not "occur with respect to the investigation, prosecution, or sentencing of" of the offense conduct charged in the Indictment. Accordingly, USSG § 3C1.1 does not apply.

### c.    Acceptance of Responsibility.

Acceptance of responsibility cannot properly be assessed until the defense has presented evidence and argument at the sentencing hearing. The defendant provided no statement or information as to the offense conduct in his interview with the Probation Office and has not apologized to Evans.

## IV.    SENTENCE RECOMMENDATION.

### A.    12 Months' Home Detention Is Required Under The Guidelines.

The Guidelines require home detention as a condition of probation in this case.[14] If the Court determines a 2-level reduction for acceptance of responsibility, the Total Offense Level becomes 10, a Zone B range of 6 to 12 months' imprisonment. If the

---

[14]    USSG § 5B1.1(a)(2).

Court follows the joint recommendation of three years' probation, the Guidelines require home detention as a condition. Thus 12 months' home detention is an objectively reasonable sentence as reflected by its conformance to the Guidelines.

**B.    Home Confinement is Consistent with the Seriousness of the Offense and Other Section 3553(a) Factors.**

A sentence that includes home detention and restitution is not greater than necessary when considering the seriousness of the offense conduct. This is a case of a Nye County deputy sheriff using his public office to falsely accuse a citizen of a crime she did not commit – not as the result of a legitimate law enforcement investigation – but as part of a fraud scheme to bring down the Board of Directors of VEA.

The warrant and probable cause requirements of the Fourth Amendment are not niceties or legal technicalities – they are bedrock principles of the constitution. This was not a technical violation of the law – this was a purposeful end-around.

As a senior officer at the NCSO, Boruchowitz well-knew the constitutional requirements for legal process and should have been modeling those principals daily, both for his subordinate officers and for the public at large, staying well on the lawful side of any constitutional line, especially in a high-profile investigation of this nature.

Instead, he jumped way over the line intentionally and through fraud covered it up by lies of omission and commission that misdirected the court and the public. The lies and deception were planned and deliberate and not the product of carelessness or neglect.

Boruchowitz abandoned his office to collude with a person he knew was on a mission to destroy Evans. He did so deliberately to conceal evidence that allowed him to

obtain court process, process that would cloak his deception and lend a false air of legitimacy to otherwise illegitimate law enforcement actions.

Most insidiously, he not only misdirected the Justice of the Peace by hiding information about Johnson, he misdirected his fellow officer by keeping the recordings out of the investigative file, and failing to note their existence in any police report. These recordings surfaced many months after the Evans arrest when they showed up in civil discovery *after* the Boruchowitz deposition in March 2021.[15]

At the time of the offense conduct, Boruchowitz was a veteran of more than sixteen years of service with the NCSO. He held the rank of Lieutenant and was in a supervisory position within the office. He had been involved in high profile arrests and appeared on popular reality television shows involving police officers and police work. At the time of these offenses, he was enrolled as a student in law school. The government understands that he has since obtained his law degree, passed the bar exam, and is eligible to practice law if he gains admission to the Nevada Bar.

This conduct, therefore, was not a one-off or the product of a temporary lapse in judgment. He was no stranger to the law and no neophyte in understanding the demands of his office. To the contrary, these unlawful acts were deliberate, calculated, and mean-spirited. Yet, as late as January 2022, when he was applying for a license to practice law, he denied that he had done anything wrong to mislead the Justice of the Peace who approved Search Warrants I and II.[16]

---

[15]    The FBI learned of the recordings and attempted to obtain them during the execution of a search warrant on the NCSO in July 2022. No recordings were contained in the investigative file or on the NCSO premises. Following the search, Boruchowitz contacted the FBI and sent the recordings electronically to the agents.

[16]    Exhibit 16 at 317-318.

Evans' arrest and termination devastated her personally and professionally, diminishing a reputation she spent years in building. Boruchowitz's suppression of exculpatory evidence deprived Evans of the ability to defend herself against his "government actions" in a court of law as well as in the court of public opinion.

A sentence of home confinement will impress upon Boruchowitz and others that this misconduct is serious. Boruchowitz intentionally deprived Evans of her freedom. The sentence here should deprive Boruchowitz of his.

### C.    Restitution Is Mandatory and Should Be Imposed As a Condition of Probation.

The Court should also enter an Order of Restitution for $244,939 ("the Recommended Award") and make the payment of restitution a condition of probation

### 1.    Evans' Loss Was The Proximate Result of the Boruchowitz's Fraud and Deceit.

Restitution is mandatory under the MVRA given Boruchowitz's plea to the fraud count.[17] To be compensable under the MVRA, the loss amount must be for pecuniary damage as the proximate "result" of the fraud or deceit.[18] Evans sustained pecuniary damage as a direct and proximate result of the fraudulent scheme, which centered on the press releases posted by Boruchowitz which disseminated false and misleading information about Evans embezzling from her employer.

That she would lose her job because of this is manifestly revealed by Evans's termination letter. There simply is no evidence that Evans job was at all in jeopardy

---

[17]    PSR ¶ 10.

[18]    18 U.S.C. § 3663A(a)(2) ("For purposes of this statute, the term "victim" means a person directly and proximately harmed *as a result of the commission of an offense* . . .); 18 U.S.C. § 3663A(b)(1) (restitution required for an offense "*resulting in* damage to or loss or destruction of property of a victim of the offense") (emphasis added).

prior to the arrest and no evidence that Evans would have been terminated despite the arrest. Her public arrest continues to dog her this day as her record still reflects the arrest and the internet still contains the press releases, diminishing her income and impeding her ability to advance in her chosen profession.

Her job loss was certainly foreseeable to Boruchowitz. As early as February 15, he told Johnson that Evans should be "gone from her job." When he learned of her firing, he said: "Winner, winner, chicken dinner." Boruchowitz knew, therefore, that Evans "being gone from her job" would be the proximate result of his deceit.

### 2. The Award Amount is a Reasonable Calculation of Evans' Loss Under the MVRA.

The district court enjoys broad discretion in determining loss amount, including awards for intangible losses. The Recommended Amount is a reasonable calculation of this loss because it is derived from an agreed upon civil settlement of $400,000 and therefore serves as a benchmark from which to calculate for her loss from the fraud. [19]

While the Court has ruled that Evans' job was not "property" for purposes of the wire fraud statute,[20] that ruling does no violence to an award under the MVRA because it compensates Evans for a "pecuniary loss" resulting from Boruchowitz's "fraud [and] deceit."[21] Nor does restitution result in a double recovery for Evans because the Recommended Award is compensation for her loss resulting from the fraud scheme and the lingering effects of that fraud scheme, as opposed to a loss from the false arrest.

---

[19] The settlement statement delineating fees and costs is found at Sentencing Exhibit 22.

[20] ECF No.'s 79 and 88.

[21] 18 U.S.C. § 3663A(c)(1) ("This section shall apply in all sentencing proceedings for convictions of . . . any offense -- (A) that is . . .(ii) . . . committed by fraud or deceit . . . and (B) in which an identifiable victim or victims has suffered a . . . pecuniary loss").

Evans did not receive "in pocket" the total award of $400,000 because she was required to pay $244,939 in attorneys' fees and expenses in obtaining that amount, netting her only $155,061. Thus, the Recommended Award puts that sum back into her pocket and brings her recovery to the full amount of her loss: $400,000.  As such, the sum ($244,939) is used merely as a benchmark for determining loss amount – and is not sought here as reimbursement for costs and expenses associated with the civil litigation.[22] Nor is the amount of recovery delimited by the loss amount in Plea Agreement.[23]  The loss amount in the Plea Agreement was derived from previous rulings by the Court and a Guidelines calculation based on that ruling, the object of the scheme as ruled by the Court being the loss of salary to the members of the VEA Board. As explained above, the Recommended Award is for harm to Evans "resulting of" the fraud scheme, not as the object of the fraud scheme.

In the event the Court does not Order restitution under the MVRA, the Court should award a fine in accord with the upper range of the Guidelines as finally determined by the Court at hearing. The government's position is that the MVRA requires restitution to Evans, and it urges that the Boruchowitz's financial assets be channeled to that purpose. For that reason, the government does not seek a fine if restitution is awarded.

---

[22]    *See Lagos v. United States,* 584 U.S. 577, 585 (2018) (holding that MVRA Section 3663A(b)(4) does not provide for reimbursement for costs of private investigation incurred in recovering for damages resulting from fraud).

[23]    PSR at 42 (Response to Government Objection 3).

**D.    Conviction Reporting Requirement and other Mandatory and Discretionary Terms and Conditions of Probation.**

As jointly recommended by the parties, the Court should require the defendant to disclose the fact of this conviction on any application for licensure from any regulatory authority in the future.[24] Boruchowitz demonstrated dissembling by omission in connection with the offense conduct manifestly requires this condition as a mandatory requirement of any probation.

Lastly, the government concurs with all other standard and special conditions of probation as set out in the PSR.[25] Specifically with regard to the search provision, the government notes that the defendant communicated with Johnson and others using electronic devices during the offense conduct, used social media to advance the fraud scheme, and used electronic devices and programs to construct news releases during the scheme. As such, the ends of justice and protection of the community dictate the imposition of this condition.

Respectfully submitted,

SIGAL CHATTAH
United States Attorney

/s/ *Steven W. Myhre*
*/s/ Justin J. Washburne*
STEVEN W. MYHRE
JUSTIN J. WASHBURNE
Assistant United States Attorneys

Dated: July 3, 2025.

---

[24]    Language found at PSR ¶ 122.

[25]    PSR at pp. 36-37.

APPENDIX A

<u>SENTENCING EXHIBIT LIST</u>

Case No. 2:23-cr-00149-APG-BNW                                 Page 1 of 3

*United States of America v. David Earle Boruchowitz*

Sentencing Exhibits on Behalf of the Government

| DATE ADMITTED | DATE MARKED | IDENTIFICATION | | DESCRIPTION |
|---|---|---|---|---|
| | | No. | Witness | |
| | | 1 | S/A Seghaier | 2-15-2019: Audio-recorded meeting between K. Johnson and D. Boruchowitz of 2.15.19 at Ian Deutch Park, Pahrump, NV (M23-QLV-7-Recording_29_Ken_J) |
| | | 1A | S/A Seghaier | 2-15-2019:  Transcript of recorded meeting at Ian Deutch Park (Bates Stamped 003781-003924) |
| | | 2 | S/A Seghaier | 2-21-19: Audio-recorded meeting between K. Johnson and D. Boruchowitz of 2.21.19 at Trish Rippie Realty, Pahrump, NV (M23-QLV7-Recording_36_Meeting) |
| | | 2A | S/A Seghaier | 2-21-2019: Transcript of recorded meeting at Trish Rippie Realty (Bates Stamped 003854-003924) |
| | | 3 | S/A Seghaier | 2-22-2019:  Search Warrant and Application for VEA Signed on 2/21/2019 by Det. Jose Parra (Bates Stamped 103831-103838) |
| | | 4 | S/A Seghaier | 2-26-2019:  Search Warrant and Application for VEA re: Embezzlement Allegations.  Signed on 2/26/2019 by David Boruchowitz (Bates Stamped 103852-103855) |
| | | 5 | S/A Seghaier | 2-26-19: BWC recording of execution of 2.26.19 Search Warrant of VEA; D. Boruchowitz Body Cam Part I (M19-1B6-2630_1.mp.4) <br><br> Pt 1: 16:39 - 16:42:20 |
| | | 6 | S/A Seghaier | 2-26-19: BWC recording of execution of 2.26.19 Search Warrant of VEA; D. Boruchowitz Body Cam Part II (M19-1B6-2630_2.mp.4) <br><br> Pt 2: 17:43:10 – 17:49:10 |

Case No. 2:23-cr-00149-APG-BNW                                         Page 2 of 3

*United States of America v. David Earle Boruchowitz*

Sentencing Exhibits on Behalf of the Government

| DATE ADMITTED | DATE MARKED | IDENTIFICATION | | DESCRIPTION |
|---|---|---|---|---|
| | | No. | Witness | |
| | | | | |
| | | 7 | S/A Seghaier | 2-26-2019:  Declaration of Probable Cause and Detention re: Arrest of Angela Evans (Bates Stamped 103872-103873) |
| | | 8 | S/A Seghaier | 2-27-2019: Video—NCSO Video Press Release re: Arrest (M22-QLV4-vea3.mp4) |
| | | 9 | SA Seghaier | 2-27-2019: Video—Channel 8 Report of Evans arrest (M01_Ser13_1A12&13_Ex.7_ Channel 8 CEO) |
| | | 10 | S/A Seghaier | 5-10-2019: Video—VEA Update Referral to NCDAO (M22-QLV4_vea update large cc.mp4) |
| | | 11 | S/A Seghaier | 12-20-2019: Video--NCSO Press Release re: Declination of Prosecution of Angela Evans (M-22 Angela Evans.mp4) |
| | | 12 | S/A Seghaier | David Boruchowitz: Oath of Office as Deputy Sheriff dated: 1.26.15 (Bates Stamped 103727) |
| | | 13 | S/A Seghaier | NCSO Policy INV 0025 Informants and Street Sources (Bates Stamped 103747-103749) |
| | | 14 (Under Seal) | S/A Seghaier | 1-13-2022: Statement of Lisa Chamlee before Character and Fitness Committee of NV State Bar (Bates Stamped 055624-055665) **FILED SEPARATELY UNDER SEAL** |

SENTENCING EXHIBIT LIST

Case No. 2:23-cr-00149-APG-BNW                                    Page 3 of 3

*United States of America v. David Earle Boruchowitz*

Sentencing Exhibits on Behalf of the Government

| DATE ADMITTED | DATE MARKED | IDENTIFICATION | | DESCRIPTION |
| | | No. | Witness | |
|---|---|---|---|---|
| | | 15<br>(Under Seal) | | Grand Jury Testimony of Lisa Chamlee-Brainard of 7/26/2023 (Bates Stamped 102332-102407) **FILED SEPARATELY UNDER SEAL** |
| | | 16<br>(Under Seal) | S/A Seghaier | 1-14-2022:  Statement of David Boruchowitz before Character and Fitness Committee of NV State Bar (Bates Stamped 055824-056023) **FILED SEPARATELY UNDER SEAL** |
| | | 17 | S/A Seghaier | 2-14-2019 to 9-25-2019:  Summary of Text Messages and Phone Records of Boruchowitz and Johnson (Bates Stamped 104578-104601) |
| | | 18 | S/A Seghaier | 2-25-2019 to 7-1-2019: Summary of Contacts between D. Boruchowitz and Ken Johnson Bates Stamped: 104489-104492 |
| | | 19 | S/A Seghaier | 2-25-2019 to 2-26-2019: Summary Exhibit:  Contacts Relevant to Arrest Bates Stamped:  104494-104506 |
| | | 20 | Angela Evans | VEA Termination Letter of 6-28-2019 (Bates Stamped 104572-104573) |
| | | 21 | Angela Evans | VEA Termination Letter of 7-17-2019 (Bates Stamped 104574-104577) |
| | | 22 | Angela Evans | Settlement Statement (Bates Stamped 104512-104571) **FILED SEPARATELY UNDER SEAL** |