CLARK HILL PLLC
Crane M. Pomerantz
Nevada Bar No.: 14103
Email:  cpomerantz@clarkhill.com
Austin Barnum
Nevada Bar No.: 15174
Email: abarnum@clarkhill.com
1700 S. Pavilion Center Dr., Suite 500
Las Vegas, Nevada 89145
Tel: (702) 697-7545
Fax: (702) 778-9709

*Attorney for Defendant Boruchowitz*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:23-CR-0149-APG-BNW |
| Plaintiff, | |
| vs. | **Sentencing Memorandum** |
| DAVID BORUCHOWITZ, | |
| Defendant. | |

Defendant David Boruchowitz ("Mr. Boruchowitz" or the "Defendant"), by and through undersigned counsel, respectfully submits this Sentencing Memorandum.   The Defendant respectfully submits that a sentence of three (3) years of probation is sufficient, but not greater than necessary, to comply with the relevant sentencing factors set forth in 18 U.S.C. § 3553.

**Points and Authorities**

**I.      Introduction**

In sentencing Mr. Boruchowitz, the Court is tasked with the following question:  What is the appropriate sentence for a former law enforcement officer who committed a non-violent offense, has no criminal history, and has otherwise made remarkable contributions to the community in which he lives? Under the circumstances of this case, a sentence of three (3) years of probation, without home detention, is appropriate and not greater than necessary to effectuate

CLARKHILL\M1816\473442\282705955.v1-7/1/25

the sentencing goals of 18 U.S.C. §3553.

Mr. Boruchowitz committed a crime for which he takes full responsibility and for which he is deeply contrite.  Having been a law enforcement officer, he is ashamed that he is in this position.   He respectfully requests, however, that the Court consider the overwhelming contributions he has made to his family and his community, and the collateral consequences of his conviction, in imposing a sentence of probation that does not include home arrest.

**II.     The Plea Agreement and Pre-Sentence Investigation Report ("PSR").**

On March 12, 2025, Mr. Boruchowitz entered his guilty plea pursuant to a written plea agreement.  He pled guilty to Counts One and Four of the Indictment, alleging Deprivation of Rights Under Color of Law in violation of 18 U.S.C. §242, a misdemeanor, and Wire Fraud, in violation of 18 U.S.C. § 1343.  The parties calculated the sentencing guidelines as follows: For Count One, to a base offense level of six (6), the parties agreed to a six (6) level enhancement because the offense was committed under Color of Law.  Plea Agreement at ¶ 12; U.S.S.G. § 2H1.1(b)(1)(B). The resulting adjusted offense level was twelve (12).

For Count Four, pursuant to U.S.S.G. § 2B1.1, the parties calculated an Adjusted Offense Level of eleven (11), as follows:  To a Base Offense Level of seven (7), the parties agreed to a six (6) level enhancement because the loss was greater than $40,000, and a two (2) level reduction because the defendant was a Zero Point Offender. Plea Agreement at ¶ 12.  The parties concluded that no increase in offense was appropriate pursuant to the grouping rules under U.S.S.G. § 3D1.4 because the Wire Fraud calculations were one (1) level less serious than the calculations for Deprivation of Rights.

To a combined adjusted offense level of twelve (12), the parties agreed to a two (2) level downward adjustment because Mr. Boruchowitz timely accepted responsibility for his crime.  Plea Agreement at ¶ 13.  The parties agreed to jointly recommend to the Court that it impose a sentence

of three (3) years of probation, but the government reserved the right to argue for a one year period of home detention. Plea Agreement at ⸿ 18. The parties also agreed that, as a condition of probation, Mr. Boruchowitz would have to disclose the fact of conviction in any application for employment, licensure, or any other authorization issued by a State or Federal regulatory authority. Plea Agreement at ⸿ 17.

The guideline calculations in the Department of Probation's (the "Department") Presentence Investigation Report ("PSR") are very different than those in the Plea Agreement.[1] The Department calculates a base offense level of twelve (12) because "the offense involved two or more participants (the defendant and K.J.)" PSR at ¶ 40. It added a six (6) level enhancement because the offense was committed under Color of Law. Plea Agreement at ¶ 12; U.S.S.G. § 2H1.1(b)(1)(B). It then applied a two (2) level enhancement for obstruction of justice, PSR at ¶ 44, which disqualified Mr. Boruchowitz from any reduction for acceptance of responsibility. PSR at ¶ 47. The Department also independently determined, based on its "review[] of the docket," that the Defendant would not qualify for the third point reduction for acceptance of responsibility because he did not timely accept responsibility. PSR at ¶ 35. The Department did not engage in any grouping analysis, calculated the guidelines only under U.S.S.G. § 2H1.1, and, as a result, concluded that the Defendant did not qualify for a two (2) level reduction as a Zero Point Offender. It calculated a Total Offense Level of twenty (20).

The Department determined that Mr. Boruchowitz is in criminal history category I, a result of a total criminal history score of zero (0). PSR at ¶ 50-55. Applying criminal history category I to a Total Offense Level of twenty (20), the Department calculates a guideline range of thirty-three

---

[1] As set forth herein, this is one of many disagreements between the Defendant and the Department regarding this case. The Defendant and undersigned counsel have enormous respect for the Department and the difficulty of the job it does. In this case however, we are profoundly confused by various positions adopted by the Department.

(33) to forty-one (41) months. PSR at ¶ 97. The PSR recommends a twelve (12) month sentence of imprisonment for Count One and a thirty-three (33) month term of imprisonment for Court Four, with the terms to run concurrently. PSR at p.34.

### III. Objections to PSR

Page 41 of the Department's revised PSR states as follows: "On May 12, 2025, the defendant, through defense counsel submitted several factual objections, *which have been resolved*. The following objections [guideline calculations] remain unresolved." PSR at p.41 (emphasis added). Unfortunately, not all of the Defendant's objections were "resolved" in the revised version of the PSR and a number of objections, both factual and legal, remain.[2]

Mr. Boruchowitz accepts full responsibility for his conduct and, while he feels strongly that several pieces of information are ill-placed in the PSR, nothing herein is intended to detract from such acceptance. But he deserves a PSR that fairly lays out the conduct in which he engaged, based on a complete review of the evidence and free from unsupported conclusions, innuendo, and otherwise gratuitous comments. These objections are intended to address those concerns.

#### A. Factual Objections

**Paragraph 20** – This Paragraph states that interviews with several VEA employees "did not reveal any evidence that AE directed work or payment for work conducted at her residence." PSR at ¶ 20. As drafted, it further omits crucial parts of the voluntary statement provided by AE's realtor and, thus, taken together, is either incorrect or misleading.

Attached as Exhibit A to the Defendant's May 12, 2025 objections (**Exhibit 1**) is a voluntary statement given by Renee West, AE's realtor, on February 28, 2019. It provides, in

---

[2]    Appended hereto as **Exhibit 1** is a copy of the Objections submitted by Defendant on May 12, 2025. Mr. Boruchowitz requested that the Department append them to the final draft of the PSR, but it did not do so.

pertinent part:

> [AE] liked the home [at 3181 Winery Road] but did not like the power line / pole & guy wire running through the back of the property.  *She said she would be speaking with the engineers at Valley Electric to see if they would either remove the cable in the yard or bury the line altogether.*  The transaction on the home proceeded as usual until the appraisal on the home came in $39,000 lower than the asking price.  At the same time, [AE] *was in contact with the engineers at VEA*. Due to the low appraisal, Mrs. Evans was concerned that the transaction would end without closing, as she already had VEA working on the pole/lines.  When we met at the property to meet with the job superintendent with regards to the block wall and electric lines, *she had said she got approval from VEA and they would be moving the guy wires*.  I was a bit surprised due to past dealings with VEA, so I asked how she got them to agree to do it, ***she smirked and said (paraphrased) that it helps when you're the boss***.  We both laughed.  I then asked her how much they were charging her, ***she said the engineer was giving her a good deal***….Mr. & Mrs. Evans then closed on the house at which point VEA started work immediately.

**Exhibit 1** at Exhibit A (US-100413) (emphasis added).

Attached as Exhibit B to the Defendant's May 12, 2025 objections (**Exhibit 1**) are a series of emails between AE and the VEA engineering department that corroborates Ms. West's statement.  AE indicates that she "is purchasing" the property at 3181 Winery Road and requests certain changes to the wiring at the property.  **Exhibit 1** at Exhibit B (US-55380 – 418).  Taken together, Exhibit A and Exhibit B lead to an unambiguous inference: AE was intimately involved in initiating the work done at her home.[3] Mr. Boruchowitz takes full responsibility for his conduct, but these documents belie any suggestion that AE did not know how the work at her home was initiated or who was paying for it.

**Paragraph 25** – As addressed fully below, the statement that Mr. Boruchowitz, in written discovery and deposition testimony, "*minimized* [his relationships with KJ and VEAMC] and *falsely testified* as to his knowledge of KJ and his role in the investigation," is unnecessary,

---

[3]    Common sense also supports this inference: it is not believable that the Chief Executive Officer of VEA would have no knowledge of how electrical work, *by VEA*, on *her home* was being paid for.

CLARKHILL\M1816\473442\282705955.v1-7/1/25

inaccurate and misleading.  PSR at ¶ 25 (emphasis added).  The Department treats the *allegations* in Count Six of the Indictment as proven.  Mr. Boruchowitz did not plead guilty to the perjury count, it is likely to be dismissed at sentencing, and there is insufficient evidence for this conclusion.

**Paragraph 26** – As part of the civil settlement, AE received a sizable settlement payment.  Because this could impact restitution ordered by the Court, if any, the Defendant respectfully submits that it is important for the PSR to note that AE *has already been compensated* for any harm she suffered as a result of her arrest.

**Paragraphs 32, 34-36** – As addressed fully below, the Defendant respectfully submits that the Department's application of an enhancement for obstruction of justice is misplaced and unfairly resulted in the additional loss of a two (2) point reduction for acceptance of responsibility.

**Paragraphs 83/84** – The Defendant strenuously objects to the inclusion of this Paragraph; it is gratuitous, unfair, and irrelevant.  First, it tells the Court nothing about the crimes of conviction.  Mr. Kunzi played no role in the conduct at issue: he was uninvolved in AE's arrest and, by February 2019, had long left his tenure as Nye County District Attorney.  To the extent it is intended to somehow provide some context to the Court regarding Mr. Boruchowitz' tenure as a law enforcement officer, it is irresponsible to rely on the opinion of a single, biased witness as a proxy for Mr. Boruchowitz' entire career, especially when the Sherriff who supervised Mr. Boruchowitz, the Nye County District Attorney during the arrest, and his chief deputy, who would

have been a defense witness at trial, apparently do not share similar opinions.[4]  Making matters worse, Mr. Kunzi's statement includes a series of salacious allegations that are *unproven*.  The information amounts to the regurgitation of a series of unflattering rumors that Mr. Kunzi may have heard, but have never been proven.  It is unclear why the Department chose to include information provided by Mr. Kunzi, or how it made the determination that his opinions are credible.  As the PSR is a document that Mr. Boruchowitz will have to live with as a criminal defendant, the inclusion of this material is particularly unfair and should be removed.  As the following paragraph, Paragraph 84, also offers no real substance, it also should be removed.

### B.    Objections to Guideline Calculations.

The guideline calculations of the parties, as reflected in the Plea Agreement, and the Department, as reflected in the PSR, are dramatically different.  The Defendant respectfully

---

[4]    In Mr. Boruchowitz' Objections to the PSR dated May 12, 2025, we wrote as follows:

If the Department intends to provide a balanced overview of Mr. Boruchowitz' career, we are happy to provide statements from others who had extremely supportive things to say about Mr. Boruchowitz.  We especially encourage the Department to weigh the statements and actions of Chief Sharon Wehrly (now deceased), who entrusted Mr. Boruchowitz with her hardest investigations and promoted him to captain several months after the arrest of AE.  Of all the speculation, innuendo, and prejudicial inferences that the Department included in the PSR, the inclusion of this quote from Mr. Kunzi is the single most unfair.

Exhibit 1 at p.7.

Apparently in response, the Department included Paragraph 84, a mostly anodyne quote from Sheriff Wehrly *that starts with an incident in which Mr. Boruchowitz was taken into custody* by the Nye County District Attorney because he made a high-profile arrest of the sitting District Attorney on embezzlement charges.  PSR at ¶¶  83-84.  It fails to include any supportive information about Mr. Boruchowitz and fails miserably as a counterweight to the inclusion of Mr. Kunzi's scandalous comments. In order to *fairly* depict Sherriff Wehrly's impression of Mr. Boruchowitz, attached as **Exhibit 2** is a declaration that Sherriff Wehrly submitted to the State Bar on behalf of Mr. Boruchowitz when he was attempting to obtain his bar license.

CLARKHILL\M1816\473442\282705955.v1-7/1/25

submits that the Department's guideline calculations are incorrect, as follows.

### 1.    The PSR Applies an Incorrect Base Offense Level

The PSR applies a Base Offense Level of twelve (12), concluding that the "offense involved two or more participants (the defendant and K.J.)."  PSR at ¶ 40; USSG § 2H1.1(a)(2). The Defendant respectfully submits that the appropriate Base Offense Level is six (6) because the offense did not involve "two or more *participants*." *Id*. (emphasis added).[5]

The application of Section 2H1.1 turns on the proper definition of "participant."  The application note to USSG § 2H1.1(a)(2) provides that "'Participant' is defined in the Commentary to §3B1.1 (Aggravating Role)."  The application note to USSG § 3B1.1, in turn, defines a "participant" as:

> a person who is *criminally responsible* for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant.

USSG 3B1.1, app. note 2 (emphasis added); *United States v. Atkinson*, 966 F.2d 1270, 1276 (9th Cir. 1992), as amended (July 22, 1992) ("a participant is a 'criminally responsible person'") (internal citations omitted).

An individual is only a participant if she/he can be held "criminally responsible" for the commission of the offense of conviction.  Mr. Boruchowitz pled guilty to 18 U.S.C. § 242, which makes it a misdemeanor for anyone acting "under color of law" to willfully deprive someone of a "right . . . secured by the Constitution or laws of the United States."  18 U.S.C. § 242.  To convict a defendant under this statute, the defendant must  "act[] under color of law when he committed

---

[5]    In its objections to the PSR, the government agreed.  It wrote as follows:  "The government has not charged KJ as an aider and abettor or conspirator in the Section 242 offense conduct and does not intend to advance argument or evidence at sentencing that KJ knowingly participated in any Section 242 offense conduct.  Accordingly, a Base Offense Level 6 . . . would apply."  Government's Objections to Draft PSR of May 5, 2025 at p.5

the acts charged . . ." Tenth Circuit Pattern Criminal Jury Instructions (2022 Ed.), § 2.17; *United States v. Reese*, 2 F.3d 870, 880 (9th Cir. 1993). By its plain language, a conviction under this statute necessarily requires that a defendant "acted in his official capacity or else claimed to do so." *Id*. Thus, only public officials acting in the course of their official duties, such as law enforcement officers, can be convicted under Section 242.

Only Mr. Boruchowitz, and not KJ, could be convicted of this crime. Because KJ, a private citizen, was never acting "under color of law," it would be legally impossible for him to be "criminally responsible" for a direct violation of 18 U.S.C. § 242.[6] As such, he cannot be a "participant" within the meaning of U.S.S.G. 2H1.1(a)(2). And if KJ cannot legally constitute a "participant" in this offense, the offense does not involve "two or more participants" and the Base Offense Level should be six (6), not twelve (12). PSR at ¶ 40; U.S.S.G. § 2H1.1(a)(4).

### 1.    The PSR Incorrectly Applies a Two Level Enhancement for Obstruction of Justice.

The PSR applies a two (2) level enhancement because the defendant "willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense." PSR at ¶ 44; U.S.S.G. § 3C1.1. The impact of the Department's application of this enhancement is exponential; not only does it increase the Offense Level by two points, it disqualifies Mr. Boruchowitz from any credit for acceptance of responsibility pursuant

---

[6]    The purpose of this enhancement was to make sure that multiple public officials working in concert are punished more strenuously than those acting alone, such as when multiple police officers assault an arrestee. It was not intended to be applied in the circumstances presented here. Significantly, in addition to 18 U.S.C. § 242, U.S.S.G. § 2H1.1 applies to several crimes which do not contain, as an element of the offense, that the defendant act under "color of law," including 18 U.S.C. §§ 241 (conspiracy against rights), 245(b) (federally protected activities), 246 (deprivation of relief benefits), 248 (Freedom of Access to Clinic Entrances Act), 1091 (genocide), and 42 U.S.C. 3631 (housing rights). This enhancement may be applied when these crimes are committed by private individuals and, thus, it is entirely logical that U.S.S.G. § 2H1.1 provides for an enhancement for "two or more participants." There is nothing in the guideline itself, the application notes, or any case that undersigned counsel could identify suggesting that the "two or more people" enhancement was intended to apply to a violation of Section 242 committed by individuals who are not acting "under color of law."

CLARKHILL\M1816\473442\282705955.v1-7/1/25

to U.S.S.G. § 3E1.1.  Aside from the patent unfairness that results, the Department's decision to apply the obstruction enhancement is significantly flawed, both legally and factually.[7]

### a. The Defendant's Conduct Does Not Constitute Obstruction of Justice as a Matter of Law.

Section § 3C1.1 provides for a two (2) level enhancement if a defendant obstructs justice. It provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

Application note 1 introduces a temporal element to the application of this guideline section.  "Obstructive conduct that occurred *prior to* the start of the investigation of the instant offense of conviction may be covered by this guideline *if* the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  U.S.S.G. § 3C1.1, note 1 (emphasis added).  As a result, the obstruction enhancement typically will not apply to conduct that occurred before the start of the government's criminal investigation, unless it was "purposefully calculated, and likely, to thwart" the government's investigation.  *Id.*

The Ninth Circuit has determined that the obstruction enhancement does not apply to "steps taken to conceal the facts" of a case if a criminal investigation is not actually pending. *See United States v. Gilchrist*, 658 F.3d 1197, 1205–06 (9th Cir. 2011) (Although a defendant does not have to know "for certain that the investigation was pending," if a criminal investigation "is not actually pending, then steps taken to conceal the facts do not amount to an obstruction of justice.")  In

---

[7]     In its objections to the PSR, the government stated as follows: "The government has agreed to dismiss the perjury charge (Count 5) as part of the plea agreement in this case.  Accordingly, the government does not intend to advance evidence or argument on this enhancement at sentencing."  Government's Objections to Draft PSR of May 5, 2025 at p.6.

*United States v. DeGeorge*, 380 F.3d 1203, 1210, 1223 (9th Cir.2004), the Ninth Circuit held that the obstruction enhancement did not apply to perjury committed during a civil suit between a defendant and his insurance company, where the criminal investigation of the defendant's fraud had not begun until after the civil suit ended.  In *United States v. Rising Sun*, 522 F.3d 989, 992, 995–96 (9th Cir.2008), the Ninth Circuit held that the obstruction enhancement could not be applied to a murder defendant who, on the night of the killings, had attempted to destroy evidence and had threatened a witness to prevent him from talking about the night's events. "The enhancement could only apply if an investigation or prosecution was already in progress when the obstructive actions were taken." *Id*.

While *DeGeorge* and *Rising Sun* construed an earlier version of U.S.S.G. § 3C1.1, their rationale still applies.   Application Note 4 sets forth a "non-exhaustive list of examples of the types of conduct to which" the obstruction enhancement applies.  These examples all have one thing in common – they occurred after an investigation or prosecution has begun. The Application Note says as much – the obstruction enhancement is intended to apply to "obstructive conduct in respect to *the official investigation, prosecution, or sentencing of the instant offense*."  U.S.S.G. § 3C1.1, Application Note 4 (emphasis added).  Conduct which occurs before, and thus cannot impede, "the official investigation, prosecution, or sentencing of the instant offense" does not warrant application of the enhancement.

The current version of U.S.S.G. § 3C1.1 also requires that the defendant's conduct must be "purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1, note 1.  Logically, it follows that if an investigation or prosecution has not begun, conduct cannot be "purposefully calculated, and likely" to thwart it.  The evidence in this case demonstrates the following: the allegedly perjurious testimony was given during a deposition on March 29, 2021, more than two years *after* the arrest of AE.  Attached as Exhibit D

to the Objections submitted by Defendant on May 12, 2025 (**Exhibit 1** hereto), is a highly redacted document, from the Federal Bureau of Investigation, showing that it did not *open* its investigation against Mr. Boruchowitz until January 24, 2022 – ten months later.  Mr. Boruchowitz could not have intended to thwart an investigation that had not begun.

Moreover, the discovery in this case shows that the FBI and A.E.'s counsel in her civil case, Andre Lagomarsino, were in close contact.  They spoke frequently and counsel was a regular source of information and documents to the FBI.  On June 13, 2023 - over two months *before* the Grand Jury returned the Indictment in this case - the government interviewed Mr. Lagomarsino. During this interview he went on at length about his perception of Mr. Boruchowitz' truthfulness during the year old deposition.  Thus, from the outset of its investigation, government was aware of and investigated the truthfulness of Mr. Boruchowitz' deposition testimony.  Consequently, the alleged perjury was *part of* the government's investigation, it did not obstruct or impede it.[8]

### b. The Obstruction Enhancement Must be Proven by a Preponderance of the Evidence and It Has Not.

Regardless of whether Mr. Boruchowitz' conduct can or cannot constitute obstruction as a matter of law, there is insufficient proof that Mr. Boruchowitz committed perjury in the first place.

---

[8] Application Note 7 to U.S.S.G. § 3C1.1 provides that the obstruction enhancement does not apply if "the Defendant is convicted of an offense covered by . . . §2J1.3 (Perjury)" unless a "*significant further obstruction* occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g. if the defendant threatened a witness during the course of the prosecution for the obstruction case." U.S.S.G. § 3C1.1 (emphasis added).  Here, there has been no "significant further obstruction."  Thus, we are left with the following anomalous result:  If Mr. Boruchowitz pled guilty to perjury, a crime he believes he did not commit, the obstruction enhancement would plainly not apply (and a two level reduction for acceptance of responsibility would apply).  By maintaining his innocence and not pleading guilty to the perjury charge, it has cost Mr. Boruchowitz at least five (5) points in the Department's guideline calculations. Application of the obstruction enhancement runs headlong into Application Note 2, which provides that the enhancement "is not intended to punish a defendant for the exercise of a constitutional right."  U.S.S.G. § 3C1.1, Note 2.  That is precisely what has occurred here – the PSR punishes Mr. Boruchowitz for exercising his constitutional right to maintain his innocence to the perjury charge. Applying the obstruction enhancement in this case is neither rational nor fair.

Indeed, the Department's decision to apply the obstruction enhancement based on a Perjury *allegation* to which Mr. Boruchowitz did not plead guilty – and is likely to be dismissed at the time of sentencing – rests on the Department's own incorrect assumptions and is otherwise based on facts that are highly disputed.

Any sentencing enhancement must be proven by a preponderance of the evidence. *United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) (due process requires district court to find facts supporting sentencing enhancement by preponderance of the evidence); U.S.S.G § 6A1.3, commentary ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case").  Because the defendant did not plead guilty to and denies the allegations in Count Six of the Indictment, the Department has *no evidence whatsoever* that Mr. Boruchowitz "*minimized* [his relationships with KJ and VEAMC] and *falsely testified* as to his knowledge of KJ and his role in the investigation…[and otherwise] provided [false testimony] under oath."  PSR ¶ 25 (emphasis added).

The italicized language represents a startling and incredibly inappropriate set of conclusions in a PSR – on a count to which Mr. Boruchowitz never pled guilty and the government has moved to dismiss.  Either the Department conducted its own independent investigation as to whether Mr. Boruchowitz "minimized" certain relationships and "falsely testified" about KJ's role in the case – an investigation the Department has not disclosed or given Mr. Boruchowitz a chance to rebut – or it is relying *entirely* on the opinion of the individual(s) from whom it obtained select pieces of discovery in this case.[9]

Two of the deposition answers that form the basis for the perjury charge in Count Six

---

[9]   It is unlikely that the Department reviewed the more than 105,000 pages that comprised discovery in this case.  Thus, it has *no basis* for making consequential determinations regarding facts about which it has no first-hand knowledge.

illustrate exactly how ill-advised the Department's application of the obstruction enhancement is.

Question:     Do you believe KJ had an axe to grind against the VEA?

Answer:        I don't believe I would characterize it that way.

Question:     Do you think he had an axe to grind with A.E.?

Answer:        I hesitate to answer because *I don't recall* a conversation with him relating to his relationship with her. *I have no recollection*, so it would be very hard to answer that.

In context, this deposition at issue took place on March 29, 2021 – more than two years after AE's arrest.  A defendant commits perjury "if she gives false testimony concerning a material matter with the willful intent to provide false testimony, *rather than as a result of confusion, mistake, or faulty memory*." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (emphasis added); 18 U.S.C. § 1621(1). "Perjury requires that a witness believe that the testimony he gives is false." *United States v. Culliton*, 328 F.3d 1074, 1080  (9th Cir. 2003); *see also Arnold v. County of El Dorado, No. 2:10-cv-3119 KJM GGH PS*, 2012 WL 3276979, at *4 (E.D. Cal. Aug. 9, 2012) (distinguishing between willfully false testimony and "inconsistencies ... which may provide fertile ground for vigorous impeachment but do not support perjury findings").  To be guilty of perjury, Mr. Boruchowitz' deposition answers "must be false as he understood the questions."  *Culliton,* 328 F.3d at 1079.

Mr. Boruchowitz' responses to the questions posed demonstrate, first and foremost, a lack of recollection regarding KJ's relationship with AE.  Unless there is proof that Mr. Boruchowitz actually had a recollection of a conversation with KJ about AE – more than two years after the fact – there is insufficient evidence that he willfully intended to lie.  Moreover, Mr. Boruchowitz' response to the question "[d]o you believe KJ had an axe to grind against VEA?" - that he would not "characterize it that way" - constitutes perjury only if that was, in fact, how he would characterize it, but responded otherwise.  Distilled to its essence, Mr. Boruchowitz was providing

his *opinion* about how he believes KJ felt about VEA. This is a particularly poor basis for a perjury finding. *Demartini v. Johns, No. 12-CV-03929-JCS*, 2015 WL 12781178, at \*8 (N.D. Cal. Jan. 22, 2015) ("[p]erjury cannot be established based on statements expressing mere opinions or beliefs but rather, requires a false statement of fact."); *see People v. Kang*, 269 Ill. App. 3d 546, 551, 646 N.E.2d 279, 283 (1995) (a statement of opinion can only serve as the basis for a charge of perjury where the witness had no such belief or opinion).[10]

The answers provided by Mr. Boruchowitz, read in context, were susceptible to several reasonable interpretations. Given the potential alternative interpretations, the Department has an insufficient factual basis to conclude that Mr. Boruchowitz made a false statement during his deposition. The evidence that his conduct was "purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction" is even more equivocal. U.S.S.G. § 3C1.1, note 1. Due to this acute lack of evidence, the obstruction enhancement should not be applied.

### 2. The PSR Incorrectly and Unfairly Failed to Deduct the Third Point for Acceptance of Responsibility.

The Department's decision not to apply a two (2) point reduction for acceptance of

---

[10] This is not the only flaw in the Department's conclusion that Mr. Boruchowitz committed perjury. The phrase "axe to grind" is a colloquialism that is unclear and requires clarification to ensure that both the person asking the question and the person answering understand it to mean the same thing. Notably, the attorney asking the questions did not clarify what he meant by "axe to grind" and did not follow up on Mr. Boruchowitz' response that he "would not characterize it that way." Counsel could have asked a very simple question: How *do you* characterize it? His failure to do so introduces significant uncertainty to the exchange that precludes a finding of perjury. Similar imprecision undermines a finding of perjury regarding Mr. Boruchowitz' answer to the question "Did you ever learn that KJ had been writing letter to the Board *threatening them with their demise*?" Mr. Boruchowitz spent almost twenty years as a law enforcement officer. While the attorney may have intended the phrase "threatening them with their demise" to refer to their removal as VEA Board members, a trained law enforcement officer may have interpreted the question to refer to their literal demise – physical harm or death. If that is the case, his answer, "I don't think anyone reported that to us" would be accurate – there is no evidence that KJ threatened physical harm on any Board member.

responsibility pursuant to U.S.S.G. § 3E1.1 appears to rest entirely upon its (mistaken) application of the obstruction enhancement.  It has not identified any other facts which would disqualify Mr. Boruchowitz from the reduction for acceptance of responsibility.

Even worse, the Department has also taken it upon itself to disqualify Mr. Boruchowitz from the third acceptance point – to the extent it applies – on the grounds that "the Court was not able to allocate their resources efficiently."  PSR at ¶¶ 35, 97.  Specifically, the Department concluded, based on its *own review of the docket in this case*, that "the government and the Court appear to have prepared for trial; thus, the Court's ability to allocate their resources efficiently *may* have been impacted."  PSR ¶ 35.

This is a dubious conclusion.  First, the parties' plea agreement expressly represents that "defendant communicated defendant's decision to plead guilty in a timely manner that enabled the USAO to avoid preparing for trial and to efficiently allocate its resources."  Plea Agreement at ¶ 13.  The government's assessment of whether it was able to conserve resources is far more reliable than the Department's "review of the docket."  Second, the objective facts support the conclusion that the Defendant timely communicated his intention to plead guilty.  As the Court is aware, the Defendant signed a highly negotiated plea agreement on March 6, 2025.  As the docket reflects, trial was set for March 24, 2025. Thus, the plea was signed *eighteen days before* trial.  As the docket further reflects, the Defendant entered his plea with the Court on March 12, 2025 – six days after he signed it and twelve days prior to trial.  Neither the plea agreement nor his entry of the plea occurred on the eve of or during trial.  Signing a plea agreement eighteen days prior to trial – and allowing all parties and the Court to halt trial preparation - is more than sufficient time for the

//

//

//

CLARKHILL\M1816\473442\282705955.v1-7/1/25

Application of the additional one point reduction.[11]

## IV.   Sentencing Argument

### A.   The Factors Set Forth in 18 U.S.C. § 3553 Support a Sentence of Three Years of Probation.

The Supreme Court explains that, in sentencing a defendant, the sentencing court should fashion a punishment that "fit[s] the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011); *see Gall v. United States*, 552 U.S. 38, 52 (2007) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue") (internal citations omitted).  Considering the relevant 18 U.S.C. § 3553 factors, a sentence of three (3) years of probation, without home arrest, is sufficient, but not greater than necessary to accomplish the goals of sentencing.

#### 1.   The Nature and Circumstances of the Offense Augur in Favor of a Probationary Sentence Without Home Arrest.

Over six years ago – on or about February 26, 2019 – Mr. Boruchowitz violated his oath as a law enforcement officer by making an illegal arrest.  PSR at ¶ 18.  In arresting AE, Mr. Boruchowitz acted rashly and committed two substantial errors: He failed to disclose his own involvement in the grass-roots organization VEA Members for Change, and all the biases that naturally come with that, and he failed to disclose the biases of KJ, including that he believed AE was unfit to lead VEA.  In doing so, he fatally undermined the credibility of the search warrants

---

[11]   The Department's conclusion that the reduction should not apply in this case sets an extremely dangerous precedent.  If its analysis is correct, the Department can arbitrarily decide how much trial preparation has taken place and how many resources can be saved at the time the defendant accepts a plea.  Not only is the Department's assessment regarding the insufficiency of *eighteen days' notice* both random and subjective, reaching this conclusion without any input from the government or the Court regarding savings to their resources is capricious and lacking in factual support.

and declaration of arrest he prepared and swore to in this case, and wound up violating AE's Fourth Amendment rights.  PSR at ¶¶ 11,16, and 19; Plea Agreement at pp.7-8.

He does not take any of this lightly.  Mr. Boruchowitz lost track of his oath as an officer, violated the trust imbued in him by the public, and will spend the remainder of his life reflecting on how his final acts working as a law enforcement officer cast a cloud over a long career of otherwise trying to make Pahrump a better and safer community.  He became too focused on being a "star" cop who could tackle Pahrump's biggest cases, believed he was the only officer who could handle these types of cases, and failed to consider effects of his actions on others.

But distilled to its essence, this was a crime of self-importance, not a crime of violence, greed, or malice.  Mr. Boruchowitz should have disclosed substantial impeachment evidence to the authorizing justice of the peace.  *United States v. Giglio*, 405 U.S. 150 (1972).  But at its core, this case criminalized a *Brady* violation.  Instead of being addressed solely as a civil or administrative matter – as most *Brady* violations are – Mr. Boruchowitz will soon be a convicted felon for conduct that is not, unfortunately, unfamiliar to law enforcement officers.

The investigation of VEA and the arrest of AE were not, by any stretch, built from whole cloth.  In assessing the seriousness of this offense, Mr. Boruchowitz respectfully requests that the Court consider the following facts:

- The investigation started from justifiable leads: there was legitimate concern in the community about the VEA rate hike and Mr. Boruchowitz had developed viable proof that there may have been payoffs relating to the former CEO's alleged sexual harassment;

- Mr. Boruchowitz appropriately developed sources of information for this investigation other than KJ, including an employee at the local TV station and at least one VEA employee who confirmed the existence of a Non-Disclosure Agreement relating to the CEO's alleged harassment;

- *The fundamental premise of the investigation of AE was true* – she had work done at her house that she did not pay for;

CLARKHILL\M1816\473442\282705955.v1-7/1/25

- Mr. Boruchowitz took legitimate investigatory steps to follow up on the allegations relating to AE, including speaking to (or directing colleagues to speak to): (a) a VEA engineer who confirmed that work was done at AE's home; (b) a friend inside VEA who provided evidence of the work orders; and (c) the builder of AE's home, who confirmed that he did not pay for the work;

- Several other officers participated in AE's arrest and agreed that there was probable cause for it;

- Both the Nye County Sherriff and Undersheriff were aware of Mr. Boruchowitz' conduct and supported the search warrants and arrest;

- Mr. Boruchowitz did not personally profit from the crime and the victim has been financially compensated as a result of a substantial civil settlement;

- Mr. Boruchowitz did not use force or violence in committing this offense;

- The conduct occurred over six years ago; and

- One of the offenses to which Mr. Boruchowitz pled guilty was a misdemeanor.

None of this excuses Mr. Boruchowitz' conduct.  But it does help place it in context.  Mr. Boruchowitz started from a place of genuine concern about a matter of extreme interest in the community – the dramatic increase in electrical rates in Pahrump by VEA after a promise not to – and went on a self-indulgent tangent, thinking that he was: (1) uniquely equipped to investigate these matters; and (2) that he could compartmentalize his own involvement in the VEA Members for Change grass-roots movement, without understanding that it would impact his investigations and without disclosing his involvement.

        **2.**      **Mr. Boruchowitz' History and Characteristics Further Support a Three Year Term of Probation Without Home Arrest.**

        **a. Mr. Boruchowitz' Deplorable Upbringing.**

In fashioning the appropriate sentence, one of the most important questions facing the Court faces is "why" – why did Mr. Boruchowitz commit this crime of self-importance by taking

on an extremely high profile and difficult case while simultaneously believing his involvement in VEA Members for Change would not impact how he conducts his investigation?

The defendant's background assists in answering this question. Mr. Boruchowitz' upbringing was, in his words, "disgusting," and, in the words of his mother, "horrendous." PSR at ¶¶ 58, 68. Mr. Borchowitz is one of eleven siblings who grew up in a small town in upstate New York. PSR at ¶¶ 57 – 58. He grew up in squalor, surrounded only by his brothers and sisters, unallowed to socialize outside the home. PSR at ¶¶ 58 – 59. His parents were neglectful, at best, and affirmatively abusive, at worst. PSR at ¶¶ 58, 60. He was perpetually competing for the attention of physically or emotionally unavailable parents. PSR at ¶¶ 58, 60.

Mr. Boruchowitz was largely unseen and unheard as a child. It is unsurprising, then, that he would be drawn to conduct that puts him in the limelight, such as taking on the highest profile cases and wanting to achieve high profile arrests – in this case, too much. In an article titled "Neglect in Childhood, Problem Behavior in Adulthood," available through the National Institute of Health's National Library of Medicine, the authors note that "neglect is not a benign phenomenon." https://pmc.ncbi.nlm.nih.gov/articles/PMC9374847/ "Research has demonstrated the strong links between childhood…neglect, and adult psychopathology," including contacts with law enforcement. *Id*. "It is likely that some of [the] social and psychological problems linked to neglect also contribute to criminality." *Id*; PSR at ¶ 115 ("There is correlation between the [adverse childhood experiences] and poor outcomes later in life.")

One result of childhood neglect is low self-esteem. https://positivepsychology.com/childhood-emotional-neglect. As a result, when children are neglected, they "may may seek out *excessive admiration from others*, resulting in *feelings of grandiosity* and interpersonal competitiveness associated with *narcissism*." https://www.sciencedirect.com/science/article/abs/pii/S0145213420303112.

We do not need to be mental health professionals to see the through-line between Mr. Boruchowitz' dysfunctional upbringing and the crime of conviction.  He craves attention and thrives on conflict.  As a law enforcement officer, he was pathologically drawn to the highest profile cases for the attention they provided, and could not resist the siren's call of a controversial arrest.  He cut corners in this case to make a controversial arrest because he needed to be seen. Now he's seen, but in the worst possible light.  A felony conviction in this case, alone - regardless of the penalty attached to it - is a devastating blow for someone who has attempted to overcompensate for his "horrendous" upbringing.

### b.    Mr. Boruchowitz' Contributions to the Community are Extraordinary.

Despite his upbringing – or, perhaps more correctly, because of it - Mr. Boruchowitz has made staggering contributions to disabled children in Pahrump.  He is the doting father of two children, an eighteen year-old daughter, who just graduated high school, and a sixteen year-old son.  PSR at ¶ 67.  Mr. Boruchowitz' son has Down Syndrome and he is responsible for taking him to most of his medical appointments.  PSR at ¶ 67.

At the time Mr. Boruchowitz' son was diagnosed with Down Syndrome, there were limited services available in Pahrump to assist people with special needs.  In response, Mr. Boruchowitz started a non-profit support group known as the Pahrump Disability Outreach Program ("PDOP").[12] PDOP has become a haven for hundreds of individuals.  Over the last several years,

---

[12]    The original version of the PSR contained almost no discussion of Mr. Boruchowitz' role with PDOP.   The two mentions of PDOP in that version remain in the current version.  *See* PSR at ¶ 68 (his mother noted that he was "*active with* Pahrump Disability Outreach Program") (emphasis added) and PSR at ¶ 69 (his wife noted that it was due to their child's diagnosis that they began Pahrump Disability Outreach program, which the defendant *continues to be involved in*.") (emphasis added).  The story of Mr. Boruchowitz' life cannot be told without some detail about PDOP, and suggesting that he is "active with" or "involved in" this organization is a vast understatement.  It was only after strenuously objecting to the PSR, *see* **Exhibit 1** at p.6, that the Department added Paragraph 86, which provides some additional detail of the effort Mr. Boruchowitz put in founding this organization and leading it since.  PSR at ¶ 86.

Mr. Boruchowitz has dedicated more than forty (40) hours a week to the organization advocating at school meetings for special needs students, and providing unwavering care, advocacy, and encouragement to those with special needs. Approximately eight years ago, the mother of a special needs individual died, leaving the child without appropriate care. Mr. Boruchowitz assumed her guardianship and continues to care for her. PSR at ¶ 90. In addition to his work with PDOP, Mr. Boruchowitz spends many hours monthly volunteering for other organizations, such as the Pahrump Holiday Task Force which is a non-profit in the community that provides free holiday meals to community members.

Mr. Boruchowitz' work with PDOP is the defining achievement of his life. Appended hereto as **Exhibit 3** are almost fifty (50) letters of support from every corner of the Pahrump community. Unprompted, almost every single letter references Mr. Boruchowitz' work with PDOP. And every single letter is effusive in their praise of his acts of selflessness and his character. The following is just a sample:

- Joann Cunningham is a close friend of Mr. Boruchowitz who describes him as a deeply spiritual man whose "[c]ommitment to service above self is simply who he is. He is a selfless man who caringly gives to others."

- Gaby Cruz is the president of a local non-profit that provides mental health services in the community. Ms. Cruz worked with Mr. Boruchowitz in two different professional settings and hails his "professionalism, integrity, and dedication." Specifically, she asks the Court "to consider his long-standing service, his character, his commitment to God and his capacity for continued good."

- Michelle Cope is a prior work colleague. She explains during their time together, "I have witnessed David's extraordinary commitment to helping young people, their families, and the broader community in ways that are both meaningful and deeply impactful. She goes on: "David is the kind of person who will drop everything when someone is in need" and describes his "consistent acts of kindness and his unwavering dedication to a community in desperate need of people like him."

- Lisa Bruno met Mr. Boruchowitz through his daughter. She identifies him as a "source of good in our town" and describes him as a person who is "dedicated to helping others and creating a community specifically for our special needs residents."

● Thomas Brown is the cousin of Mr. Boruchowitz' spouse and stated that Mr. Boruchowitz has "been like an older brother to me." Significantly, he explains that he has "never seen him deny help to those around him" and describes him as "a light to those around him and a positive influence on others"

● Timothy Sutton was the Nye County Manager at the time of Mr. Boruchowitz' arrest. He recognizes the "significant contributions" that Mr. Boruchowitz has made to the community and how he has repeatedly demonstrated his "dedication to [its] well-being," including acts of kindness performed for Mr. Sutton, personally.

● Matthew and Jules Aver know Mr. Boruchowiz through his work with PDOP. They describe Mr. Boruchowitz' "unwavering kindness" and view him "as a positive force" in their life and are "blessed to have him in our life."

● Brady Adams states that Mr Boruchowitz "has shown generosity, compassion, and concern for others." He notes that in Mr. Boruchowitz' daily life, he goes "out of his way to lend a hand, provide encouragement, and uplift those around him."

● Jordan Villane is a single mother of an autistic child. In relation to Mr. Boruchowitz, she states that he "loves so deeply and he cares immensely and anyone that has met him and gave him an opportunity to get to know them would say the same thing." She considers him a "powerful role model in my life" and states, admiringly, that if "my father weren't already my hero, it would definitely be David."

● Thomas Wild is Mr. Boruchowitz' former next door neighbor and provides some detail about Mr. Boruchowitz work with PDOP, characterizing it as a "vital asset to the betterment of the disabled and the youth of the community" and noting that PDOP "has raised thousands of dollars to help the disabled obtain therapies and surgeries that were previously beyond financial reach"

● Andrew Witten is a local business owner who attends the same church as Mr. Boruchowitz. He explains that he is aware of "many circumstances where David has gone out of his way to help those in need." He further notes that Mr. Boruchowitz "has a gift with the youth in sensing who might be struggling. I know that he has a real sincere love for our youth and really looks out for their welfare and being.

● Al Yunker knows Mr. Boruchowitz through his work in the community. He has observed that Mr. Boruchowitz "is always doing activities in the community for the children and providing for families in a way that few organizations do. He adds that he has "always known David to be professional, courteous and respectful"

● Johnny O'Neal is a community volunteer who has served as president of Pahrump Youth Sports. He describes Mr. Boruchowitz as the law enforcement officer "that the other officers would call for advice or clarification of instructions." He characterizes him, alternatively, as a "spiritual influence in our community," a "[t]ranscendant leader," and "a giver."

CLARKHILL\M1816\473442\282705955.v1-7/1/25

● Debra Pillman serves as a foster parent. She notes that "David and his family have exceptional kindness and support, welcoming us into their home and providing respite care for our foster children on numerous occasions." She further observes that he has "provided invaluable guidance and support in navigating the complexities of special education, connecting us with crucial community and medical resources."

● William Scarlett is a community member who "[o]ver the years" has witnessed "David show up for others time and again – not because he had to, but because that's who he is at his core . . . one that truly cares about others." He describes instances in which Mr. Boruchowitz "quietly helped people in our greater community who were going through hard times."

● Stanley Parry, a prominent member of the community, explains that his experience with Mr. Boruchowitz "has been deep and rewarding." He goes to note that Mr. Boruchowitz has left him "with the deep impression of a person that is compassionate and caring."

● Scott Shepston knows Mr. Boruchowitz from his work in the community. He calls him "a truly remarkable individual whose tireless dedication to others has touched countless lives." He states that "David has never hesitated to step up for those in need" and characterizes him as a "pillar of strength and kindness in our community."

● Barbara Tucker worked with Mr. Boruchowitz at the Nye County Sherriff's Office. She explains that David's son "is achieving goals that no one ever thought possible only because of [his and his wife's] commitment to his continued success and the close bond [his son] shares with parents." She further describes him as a "person that lends a hand at a moments notice to those in need never expecting anything in return."

● Erica Johnston is the owner of a farm in Pahrump who has worked closely with Mr. Boruchowitz with PDOP. She states that she "know[s] how much he loves working with [developmentally disabled] individuals  and how much he is dedicated to helping them." The Defendant selflessly hosted a funeral for Ms. Johnston's mother and a subsequent baby shower for Ms. Johnston at his own home.

● Leslie Molenda describes how working as a volunteer for PDOP helped her "find a purpose in my life" after going through tough times. She notes that the "community would be in dire straits and the kids would suffer a great loss without him."

Perhaps the most touching letter of support comes from Mr. Boruchowitz' wife Stephanie. Her letter is exceptionally raw, honest, and heartfelt. It is not a hagiography. It concedes that Mr. Boruchowitz is a flawed person, but she still identifies him as someone "whose heart has always been tethered to the good of others." She has come to understand that "his selflessness, his unwavering commitment to others, is simply who he is – a man who prioritizes service above all

CLARKHILL\M1816\473442\282705955.v1-7/1/25

else, even when it costs him dearly on a personal level."  Even so, she notes that his "generosity knows no bounds, and his dedication to improving the lives of children and families has touched so many hearts."  She candidly states that:

> [a] day does not go by where he does not express profound remorse for the problems he has caused – for the disappointment he brought to the community he cherishes, the agency [Nye County Sherriff's Office] he has worked so hard to uphold, and the family that has stood beside him through it all.  The burden of his mistake weighs heavily on his heart, and his determination to make amends only reinforces the strength of his character.

Letter dated May 28, 2025 from Stephanie Boruchowitz.

These letters beg a single question:  How is it that someone who regularly displays this much empathy and kindness in his everyday life – who has made contributions to the special needs community (the most vulnerable among us) that fairly can be characterized as extraordinary - could also commit the crime to which he pled guilty?  These letters provide the prism through which the Court should view this case: Mr. Boruchowitz did not commit this crime out of greed or due to a lack of compassion.  Instead, he intended to do the right thing – ferret out perceived fraud at VEA, both by the former CEO and by AE – but, because he is flawed individual, whether due to his upbringing or otherwise, his moral compass ran amok and a sense of grandiosity took over.  He did the wrong thing for the right reason.

Mr. Boruchowitz respectfully submits that the sentence imposed by the Court should reflect this.  A sentence that takes Mr. Boruchowitz out of the community for which he does so much good does not vindicate the sentencing goals of 18 U.S.C. § 3553.  As his wife notes, the stain of a felony conviction for someone who has worked his whole life to uphold the law, is sufficient black mark that something more than that provides no more than marginal gains to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment.

Moreover, the potential collateral consequences of this conviction are significant.  Mr. Boruchowitz has not been employed as a law enforcement officer since October 2023 and, as a

result of this conviction, has little hope of ever returning to his chosen profession. In addition, having graduated from law school, Mr. Boruchowitz was looking forward to obtaining a bar license so he could practice law, a prospect that seems unlikely at this juncture, especially after Mr. Kunzi rejected his initial application while he worked as the Director of Admissions for the State Bar of Nevada. Even if he were to attempt to apply for a license through the State Bar of Nevada, the terms of the plea agreement (and the application itself) require he disclose his felony conviction thereby significantly undermining a likelihood of success. All of these provide just punishment.

Because Mr. Boruchowitz is no longer working as a law enforcement officer and because he has no criminal history, protecting the public from further crimes is a lesser concern at sentencing. 18 U.S.C. § 3553(a)(2)(C). Due to the media coverage of this case, and the notoriety of Mr. Boruchowitz within the Pahrump community, his mere prosecution and plea affords adequate deterrence and has shined a light on the conduct of law enforcement officers in Nye County. *Id*. at § 3553(a)(2)(B). An educated and professional person, Mr. Boruchowitz would not appear to need any unique vocational training, medical care, or other correctional treatment. *Id*. at § 3553(a)(2)(D).

A sentence of probation that includes home arrest will necessarily limit his work with PDOP and as an advocate for children with special needs in Pahrump. Because such a sentence will negatively impact the community, a three year term of probation without home arrest is appropriate and not greater than necessary to effectuate the sentencing goals of 18 U.S.C. §3553.

### B.    Potential Imposition of Restitution

The government has expressed its intention to seek "an order of restitution in an amount of $244,939.95." PSR at ¶ 28; Government's Objections to Draft PSR of May 5, 2025 at p.5. The Department, for its part, recommends restitution in an "undetermined" amount. PSR at ¶ 110.

Regardless of amount, the imposition of restitution for harm suffered by AE is not appropriate in this case.

Restitution is governed by the Mandatory Victim Restitution Act of 1996, codified at 18 U.S.C. § 3663A (the "MVRA"). The MVRA "requires a district court to order restitution when (1) a defendant commits an 'offense against property,' and (2) there is a 'victim." *United States v. Luis*, 765 F.3d 1061, 1063 (9th Cir. 2014); 18 USC § 3663A(b)(1). While the MVRA "does not define what constitutes an 'offense against property,' the Ninth Circuit has adopted a broad reading of the phrase: It covers all crimes that infringe a victim's property interest." *United States v. Schurman*, 634 F. Supp. 3d 704, 707 (N.D. Cal. 2022). *Lagos v. United States*, 584 U.S. 577, 580-81 (2018) emphasizes that the MVRA is a statute of limited scope. It specifically lists the crimes to which it is applicable and "the kinds of losses and expenses that it covers." *Id*. at 584. Courts are not required to interpret it "in a way that favors an award." *Id*. at 583.

Using this as a guidepost, there are at least three problems with the imposition of restitution in the amount of $244,939.95 as sought by the government. First, AE is not a "victim" within the meaning of the MVRA. As an initial matter, the government must show by a preponderance of the evidence that an individual is a victim of the crime on which the defendants were convicted, and that the victim's losses were caused by the defendants' offense conduct. *Luis*, 765 F.3d at 1063; *United States v. Holmes*, 673 F. Supp. 3d 1049, 1054 (N.D. Cal. 2023), *aff'd*, 129 F.4th 636 (9th Cir. 2025), 673 F. Supp. 3d at 1054; *United States v. Gossi*, 608 F.3d 574, 579 (9th Cir. 2010). The government will be unable to make such showing.

Mr. Boruchowitz pled guilty to two counts in the Indictment: (1) Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242 (the "Section 242 Offense"); and (2) Wire Fraud, in violation of 18 U.S.C. § 242. By its plain language, the MVRA only applies to "crimes against property." *Luis*, 765 F.3d at 1063. While wire fraud is a property crime, *Kelly v. United*

*States*, 590 U.S. 391, 399 (2020), the Section 242 Offense is not.  It is grouped in Title 18 with civil rights offenses.  The unmistakable gist of both the Indictment and the Plea Agreement was that the Defendant "arrested [AE] without probable cause." Plea Agreement at p.8. The elements of the Section 242 Offense require "an unreasonable seizure" of her person, not a deprivation of property.  While the violation of AE's constitutional right not to be arrested without probable cause is significant and not to be minimized, it also is not one of the crimes enumerated in 18 U.S.C. § 3663A(c)(1)(A) for which restitution is appropriate.  Thus, the government only may seek restitution under the MVRA for wire fraud count.

But AE is not a victim of the wire fraud count.  Pursuant to the MVRA:

> the term "victim" means a person directly and proximately harmed as a result of the *commission of an offense for which restitution may be ordered* including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person *directly harmed* by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2) (emphasis added).

As the Court recalls, there was significant briefing in this case on the issue of whether the government's indictment passed the convergence requirement under *Monterey Plaza Hotel Ltd. Partnership v. Local 483 of Hotel Employees & Restaurant Employees Union, ALF-CIO*, 215 F.3d 923 (9th Cir. 2000).  In its Order Granting in Part Government's Motion for Reconsideration (ECF No. 88), the Court confirmed that intending to cause AE to lose her job did not suffice for intending to obtain property.  ECF No. 88 at p.3-4.

The Court reversed its dismissal of the wire fraud counts on "narrow grounds."  ECF No. 88 at p.2.  In its motion for reconsideration, the Government argued that "Boruchowitz intended to 'trick Board members into resigning' so they 'could avoid the Member opprobrium generated by the deception of the false arrest." ECF No. 88 at p.13.  Based on *that* theory, the Court reinstated the wire fraud counts.  The Court stated:

"Boruchowitz may have intended to execute his scheme *by deceiving the VEA board members (not the voting VEA members) about Evans's conduct, thereby inducing them to resign their term positions under false pretenses.* If so, Boruchowitz intended to deceive the VEA board members (with the artifice involving Evans's arrest) and to cheat the VEA board members (by tricking them into giving up their term positions under false pretenses). That satisfies convergence."

ECF No. 88 at p.13 (emphasis added).

The Court concluded that "[b]ecause the indictment alleges the Boruchowitz intended to deprive the *board members* of money or property, I will not dismiss the wire fraud charges as to the VEA board position." ECF No. 88 at p.13 (emphasis added). The Court's ruling was unambiguous: the Indictment survived dismissal to the extent it alleged that the VEA board members were the victims. Because the Indictment would not survive if AE were the victim, it is entirely anomalous for her to be compensated as a victim for restitution purposes. *Cf. United States v. Luis*, 765 F.3d 1061, 1068 (9th Cir. 2014) ("The basic question that a proximate cause requirement presents is 'whether the harm alleged has a sufficiently close connection to the conduct' at issue") (internal citations omitted).

The Court further held that "Evans's at-will employment is not property within the wire fraud statute's meaning." ECF No. 88 at p.11  Thus, "neither Evans nor the VEA had a property interest in Evans's at-will employment relationship at the time of the alleged scheme to defraud." *Id*. Because the MVRA is intended to vindicate a victim's *property interest*, *United States v. Schurman*, 634 F. Supp. 3d 704, 707 (N.D. Cal. 2022), restitution for loss of at-will employment is not appropriate under the MVRA.

Second, even if AR is a "victim" within the meaning of the MVRA, she has already been compensated for harm suffered as a result of her arrest, in the form of a substantial civil settlement with both Nye County and the Defendant.[13]  PSR at ¶ 26.  One of the "fundamental principles of

---

[13]    She also received a substantial settlement from VEA resulting from her termination.

restitution" is that "victims may not receive restitution that exceeds the losses they actually suffered." *United States v. Jesenik*, 702 F. Supp. 3d 1024, 1032 (D. Or. 2023).

*Jesenik* held that the amount of restitution a victim receives should be reduced by payments already received in civil lawsuits against the wrongdoer. *Id*. at 1032-37. Its holding is consistent with the plain language of the MVRA, which contemplates the reduction of the restitution obligation by amounts already received by the victim. It provides that when the return of the property lost by the victim is "impossible, impracticable, or inadequate," the defendant must pay the victim "an amount equal to . . . the value of the property" *reduced by* "the value . . . of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B); *Robers v. United States*, 572 U.S. 639, 640 (2014). To the extent the government is seeking restitution for AE in an amount that would exceed the losses she actually suffered – and for which she has already been compensated – such restitution may not be ordered.

Nor is the Court bound to impose restitution in an amount equal to the losses used to calculate the guideline loss calculation. There is no "categorical rule" that the restitution amount ordered by the Court must be tethered to the "the amount of loss found when applying Sentencing Guidelines § 2B1.1(b)(1) or similar loss-based Guidelines sections." *United States v. Dadyan*, 76 F.4th 955, 959 (9th Cir. 2023) *see United States v. Gossi*, 608 F.3d 574, 582 (9th Cir. 2010) ("Because the advisory Sentencing Guidelines and restitution to victims under the MVRA clearly focus on different aspects of the offense and serve different purposes, we reject Gossi's argument that we should look to the advisory Sentencing Guidelines for calculating the victim's losses"). Thus, restitution in an amount between $40,000 and $95,000 is not required simply because that is the loss amount used by the parties to calculate the guidelines in the plea agreement.[14]

---

[14] The Plea Agreement merely provides that Mr. Boruchowitz "may be required to pay full restitution to a victim of the offense to which defendant is pleading guilty." Plea Agreement at ¶ 6.

Finally, even if AE is a victim, and the imposition of restitution somehow would not result in a double recovery, the government is seeking restitution for amounts which are fundamentally not recoverable.  According to the government, the Court should impose restitution in the amount of $244,939.95, "which is the total amount of costs and attorney' fees A.E. incurred during the civil proceedings."  PSR at ¶ 28.  "It is the government's burden to prove the amount of loss for restitution purposes by a preponderance of the evidence." *United States v. Holmes*, 673 F. Supp. 3d 1049, 1054 (N.D. Cal. 2023), *aff'd*, 129 F.4th 636 (9th Cir. 2025)

Pursuant to *Lagos*, "costs and attorney's fees A.E. incurred during the civil proceedings" are not recoverable under the MVRA.  In that case, General Electric Capital Corporation, which issued millions of dollars in loans pursuant to bogus loan applications, sought expenses it "incurred during its own investigation of the fraud and during its participation in [the defendant's company's] bankruptcy proceedings."  584 U.S. at 579.  Eschewing a broad interpretation of the MVRA, the Supreme Court concluded that restitution under 18 U.S.C. § 3663A(b)(4) does not include amounts spent on private investigations or in civil litigation.  *Id*. at 581.

The request for attorney's fees and costs is even more egregious if, as the Defendant strongly suspects, AE's attorney represented her in the civil case on a *contingent basis*.  If that is the case, the amounts being sought by the government as restitution do not reflect actual expenses incurred by AE at all and would result in a windfall to AE and/or counsel.

**C.    Objection to Conditions of Supervision.**

The PSR recommends six Special Conditions of supervision. PSR at ¶ 117 – 122.  If the Court is inclined to follow the parties' recommendation and impose a sentence of probation, Mr. Boruchowitz respectfully objects to the imposition of the first two conditions – access to financial

//

//

information and the prohibition on assuming debt obligations. [15]  PSR at ¶¶ 117 and 118.

The Court has "wide latitude" when imposing conditions of probation and supervised release.  *United States v. Medenbach*, 2018 WL 3301257 (9th Cir. 2018) (probation); *United States v. Blinkinsop*, 606 F.3d 1110, 1118 (9th Cir. 2010) (supervised release).  While a condition of release does not have to be related to the offense of conviction, it must be "reasonably related to the goals of deterrence, protection of the public, or rehabilitation of the offender, and involve no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release." *Id*. at 1119.  The Court is "statutorily required 'to look forward in time to crimes that may be committed in the future.'"  *Id*.   The test for validity of probation conditions "is whether the conditions are primarily designed to meet the ends of rehabilitation and protection of the public." *United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir. 1988).

Setting aside that the Defendant's crimes of conviction are not financial in nature and, thus, these conditions bear no relation to *them*, nothing in his background suggests that the Department needs access to Mr. Boruchowitz' financial information or that he should be prohibited from incurring new credit charges or opening additional lines of credit.  There is no evidence in the PSR, or elsewhere, that Mr. Boruchowitz has been irresponsible with money, that he has gotten into trouble because of financial dealings, or that monitoring his financial situation will advance the only permissible goals of supervision: deterrence, protection of the public, or rehabilitation of the offender.  *Blinkinsop*, 606 F.3d at 1119.

The Department's stated bases for the imposition of these conditions do not justify their inclusion.  According to the PSR, these conditions "*may help* the probation officer set the

---

[15]    Even if the Court, in its discretion, imposes a sentence of imprisonment, Mr. Boruchowitz respectfully objects to the imposition of these conditions as part of a term of supervised release.  It appears that the Ninth Circuit applies the same analysis regardless of whether the conditions imposed are for probation or supervised release.

appropriate collection parameters for monetary conditions, deter and detect economic crimes, verify and monitor self-employment, or assist disorganized, impulsive defendants to gain control of their financial situation." PSR at ¶ 118 (emphasis added). First, whether these conditions "may help" the Department falls far short of the requirement that the condition must be "reasonably related to the goals of deterrence, protection of the public, or rehabilitation of the offender, and involve no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release." *Blinkinsop*, 606 F.3d at 1119.

Next, none of the Department's stated bases are tied, in any respect, to the Defendant's personal characteristics. There is no evidence that he is "disorganized [or] impulsive." Indeed, as the PSR reflects, the Defendant produced to the Department an overwhelming amount of financial data, perfectly organized. PSR at ¶ 87. He even serves as the trustee for an individual with special needs. PSR at ¶ 90. Mr. Boruchowitz may have significant flaws, but disorganization is not one of them. Nor is there any need to set a special condition to "deter and detect economic crimes" or "verify and monitor self-employment." Mr. Boruchowitz has been the organizer and leader of PDOP and other charities for over fifteen years, without the slightest whiff of financial impropriety. PSR at ¶ 91. Finally, the need "to set the appropriate collection parameters for monetary conditions," depends, first and foremost, on whether the Court sets a restitution obligation. Even if the Court does, there is no reason that the Department and Mr. Boruchowitz cannot set a reasonable payment plan at the outset of his supervision, and modify it, as necessary, if circumstances arise. Mr. Boruchowitz has not given the Court any reason to doubt his willingness or ability to comply with any financial terms it imposes. As a result, the imposition of these two financial conditions are greater than reasonably necessary to achieve the purposes of probation/supervised release and do not meet the ends of rehabilitation and protection of the public.

//

**D.   Conclusion**

For all of the foregoing reasons, Mr. Boruchowitz respectfully requests that the Court impose a sentence of three (3) years of probation, without a condition of home arrest, with the conditions set forth herein.

Dated: July 8, 2025

Respectfully submitted,

CLARK HILL PLLC

*/s/ Crane Pomerantz*
Crane M. Pomerantz, Esq.
Nevada Bar No. 14103
1700 S. Pavilion Center Drive
Las Vegas, NV 89135

*Attorneys for Defendant Boruchowitz*

CLARKHILL\M1816\473442\282705955.v1-7/1/25

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2025, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

/s/ Jamie Soquena
An Employee of CLARK HILL PLLC

CLARKHILL\M1816\473442\282705955.v1-7/1/25